CLEVELAND-CLIFFS IRON COMPANY *v.* CORPORATION
& SECURITIES COMMISSION.

1. COURTS — PRECEDENTS — TAXATION — CORPORATIONS — FRAN-
CHISES—INTERSTATE COMMERCE—INTRASTATE BUSINESS.

Judicial precedents established for exclusively interstate busi-
nesses either under the due process clause or the interstate
commerce clause are of no concern when the Supreme Court
has before it to determine the validity of a corporate fran-
chise tax upon a corporation which does both interstate and
intrastate business (US Const, art 1, § 8; Am 14; CLS 1952,
§§ 450.304, 450.305; CLS 1956, §§ 450.304b, 450.305e).

2. APPEAL AND ERROR—CORPORATION TAX APPEAL BOARD—FINDINGS
—EVIDENCE.

Findings of fact by the corporation tax appeal board are binding
upon the Supreme Court, where the findings are supported by
competent evidence.

3. TAXATION — FOREIGN CORPORATIONS — FRANCHISES — INVESTMENT
IN STOCKS.

Findings of corporation tax appeal board that plaintiff foreign
corporation's investments in steel stocks were used generally

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 9, 10] 51 Am Jur, Taxation §§ 814, 815.
[2] 42 Am Jur, Public Administrative Law § 211.
[3] 51 Am Jur, Taxation §§ 814. 845.
[4, 11] 51 Am Jur, Taxation §§ 817–819, 848.
[5] 51 Am Jur, Taxation §§ 809, 843.
[6, 8, 12] 51 Am Jur, Taxation §§ 817–819, 847.
[7] 51 Am Jur, Taxation §§ 817–819.
[9, 10] 51 Am Jur, Taxation § 847.
[13] 51 Am Jur, Taxation §§ 918, 919.
[14] 51 Am Jur, Taxation §§ 206–208.
[15] 51 Am Jur, Taxation §§ 203, 862.
[16] 51 Am Jur, Taxation § 847.
[17, 19] 51 Am Jur, Taxation §§ 862, 863.
[18] 51 Am Jur, Taxation §§ 847–849.

in its over-all business, including the business it carried on in this State, *held*, supported by evidence that dividends there-from and sales thereof were commingled with the company's cash accounts and so used for various capital outlays within this State, hence, were to be included in computation of annual franchise tax (CLS 1952, §§ 450.304, 450.305).

4. SAME—FOREIGN CORPORATIONS—INVESTMENTS—FRANCHISE TAX.
   The fact that assets of a corporation which include dividend paying stocks are denominated as "investments" does not ex-clude them from use in computation of annual franchise fee, since the mere possession of such assets is a business advantage of great value, enhancing the power of the corporation to use more economical business methods and facilitate purchases (CLS 1952, §§ 450.304, 450.305).

5. SAME—CORPORATIONS—FRANCHISE FEE—DOING BUSINESS.
   The State corporate franchise fee is a tax imposed upon the privilege of doing business within this State in a corporate capacity and not a tax on the assets or property of the cor-poration (CLS 1952, §§ 450.304, 450.305).

6. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—APPORTIONMENT OF VALUE AS GOING CONCERN.
   The State corporate franchise fee for a foreign corporation's privilege of doing business within this State is measured by a fair apportionment of the total value as a going concern (CLS 1952, §§ 450.304, 450.305; CLS 1956, § 450.305e).

7. SAME—CORPORATIONS—FRANCHISE FEE—MEASUREMENT OF VALUE.
   The State corporate franchise fee is a tax on the value of the exercise of a privilege in this State, the value being ascer-tained through the application of property, payroll, and sales factors to the fair average stock value or the paid-up capital and surplus (CLS 1952, §§ 450.304, 450.305).

8. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—UNITARY ENTER-PRISE.
   Whether or not foreign corporation which conducted mining, lumbering and transportation operations within and without this State was a unitary enterprise is not a controlling factor in ascertaining the amount of the corporate franchise tax of foreign corporation engaged in such various activities (CLS 1952, §§ 450.304, 450.305).

9. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—DUE PROCESS.
   One aspect of the validity of a State corporate franchise fee

imposed upon a foreign corporation which does both an inter-
state and intrastate business is whether, by virtue of tax
benefits conferred in general police protection and otherwise
or on account of ideas of territorial sovereignty concerning
occurrence of taxable incidents within its borders, there is
furnished a due process foundation necessary to sustain the
exercise of the State's taxing power (CLS 1952, §§ 450.304,
450.305).

10. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—REAL AND REA-
SONABLE RELATION TO PRIVILEGE GRANTED.

A State corporate franchise tax upon a foreign corporation, to
be valid, need not be based solely on the amount of business
done or property owned within this State so long as it bears
some real and reasonable relation to the privilege granted or
to the protection of the interests of the State (CLS 1952,
§§ 450.304, 450.305).

11. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—DUE PROCESS
—APPORTIONMENT.

The imposition of a privilege tax upon a foreign corporation
doing both interstate and intrastate business in this State does
not offend due process by including in its tax formula, either
as a measure or base, the value of capital stock employed by
the corporation in its over-all business, provided only that
the tax paid by the corporation be reasonably apportioned
to the privileges enjoyed by it in the taxing State (CLS 1952,
§§ 450.304, 450.305; CLS 1956, § 450.305e).

12. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—REASONABLE-
NESS OF APPORTIONMENT.

The apportionment of approximately 34% of foreign corpora-
tion's paid-up capital and surplus or fair average value of its
corporate stock as a measure of the privileges granted it by
this State *held*, not shown to have been unreasonable or to
have worked a gross inequity under circumstances presented in
corporation tax appeal board's assessment of State's annual
corporate franchise fee (CLS 1952, §§ 450.304, 450.305).

13. SAME—FOREIGN CORPORATIONS—APPORTIONMENT—BURDEN OF
PROOF.

One who attacks a formula of apportionment of a State's tax
assessment on a foreign corporation doing both an interstate
and intrastate business within the State has the burden of
showing by clear and cogent evidence that it results in extra-
territorial values being taxed (CLS 1952, §§ 450.304, 450.305).

14. Constitutional Law—Interstate Commerce—Taxation.

The interstate commerce clause of the Constitution of the United States is, as a factual and economic matter, concerned with impediments to the free flow of commerce between the States whether they arise from a rapacious extra-jurisdictional levy by a taxing State, from an exorbitant taxation by a taxing State with ample jurisdiction as a matter of due process or a more modest tax capable of use so cumulative as to be destructive (US Const, art 1, § 8).

15. Taxation—Interstate Commerce.

A State may not tax interstate commerce, directly or indirectly, by the use of a fiscal formula, whatever may be its appearance of certitude, so as to project the taxing power of the State plainly beyond its borders (US Const, art 1, § 8).

16. Same—Foreign Corporations—Franchise Fee—Interstate Commerce.

Formula for computing State annual corporate franchise fee on foreign corporation engaged in mining, lumbering, tranportation and other operations in this and other States by taking a percentage of the paid-up capital and surplus derived from average of percentages of property, payroll, and sales factors fairly attributable to this State was not in violation of the interstate commerce, due process, or equal protection clauses by reason of its inclusion of stocks of steel companies that were used in the over-all business of the enterprise as a part of the base for computing the fee (CLS 1952, §§ 450.304, 450.305).

17. Same—Foreign Corporations—Privilege Tax—Book Value—Jurisdiction.

It is not a *sine qua non* for the application of a privilege tax of a foreign corporation, based upon book value, that each of the asset properties be itself directly subject to the taxing authority of the jurisdiction (CLS 1952, §§ 450.304, 450.305).

18. Same—Foreign Corporations—Franchise Fee—Assets Beyond the State—Constitutional Law.

State annual corporate franchise fee upon foreign corporation for privilege of conducting in this State of both interstate and intrastate business operations may properly be measured by capital wherever located, and in determining the value of the intrastate privilege, the existence of property beyond the State boundaries has a very real effect upon the value of

the privilege granted, hence, a fair recognition of such effect does not offend either the due process, equal protection or interstate commerce clauses of the Constitutions of the United States or Michigan (US Const, art 1, § 8, Am 14; Mich Const 1908, art 2, §§ 1, 16).

19. SAME—FOREIGN CORPORATIONS—FRANCHISE FEE—APPORTIONMENT —MINING CORPORATION.

Whether foreign corporation, engaged in mining, lumbering, transportation, and sales of its products in this and other States should be classed as a mining corporation and subject, therefore, to a particular section of the corporate franchise fee act, is not determined, where the tax imposed by the act is determined to be apportioned the same whether it be a mining corporation or any other profit corporation doing both an interstate and intrastate business in this State (CLS 1952, §§ 450.304, 450.305; CLS 1956, § 450.304b).

20. COSTS — PUBLIC QUESTION — FOREIGN CORPORATIONS — ANNUAL FRANCHISE FEE.

No costs are allowed on appeal from corporation tax appeal board in proceeding to determine whether or not stocks in corporations owned by foreign corporation, which property had a situs elsewhere, were subject to annual corporation franchise fee, a public question being involved (CLS 1952, §§ 450.304, 450.305; CLS 1956, §§ 450.304b, 450.305e).

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from the Michigan Corporation Tax Appeal Board. Submitted June 13, 1957. (Docket No. 44, Calendar No. 47,064.) Decided March 6, 1958.

The Cleveland-Cliffs Iron Company, an Ohio corporation engaged in mining and other operations in Michigan and elsewhere, contested the right of the Michigan Corporation & Securities Commission to include, for purpose of determining corporate franchise fee, the value of corporate stock of customer steel companies held by it. From adverse ruling, plaintiff appealed to Corporation Tax Appeal Board. Plaintiff appealed from the Corporation Tax Appeal Board's determination of tax. Affirmed.

*Snyder & Loomis* and *Jones, Day, Cockley & Reavis,* for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *T. Carl Holbrook* and *William D. Dexter,* Assistants Attorney General, for defendant.

Kelly, J. (*dissenting*). Plaintiff filed its 1952 annual report as a mining company and paid a franchise tax for that year in the sum of $51,558.55. Defendant commission found that there was a deficiency of $62,525. Plaintiff appealed to the corporation tax appeal board and a hearing was had before said board on December 12, 1955. Plaintiff, on leave granted by this Court, appeals from the board's determination that there was a balance due on said tax of $62,677.59.

Plaintiff, an Ohio corporation, came into being on July 9, 1947, when the former, the Cleveland-Cliffs Iron Company, was consolidated with the Cliffs Corporation. In applying, as a foreign corporation, for the privilege of doing business in this State, plaintiff made the following sworn statement as to its purpose and the kind of business it would engage in:

"Mining, dealing in and transportation of iron ore, coal and other minerals and metals; smelting, refining and manufacturing all or any of such ores or minerals, including the manufacture of iron and steel and products produced or manufactured from cutting, selling and dealing in standing timber, lumber and the products thereof, or in connection therewith; the conduct of any business and the doing of any act or thing necessary or incidental thereto."

Plaintiff was qualified as a foreign corporation to do business in 12 States, with 4 operating departments, consisting of iron ore, coal, lake transportation and land and lumber.

The executive, principal accounting, general business and sales office of the plaintiff are located in Cleveland, Ohio, and plaintiff's general business and affairs are conducted and controlled by its board of directors and officers functioning from said Ohio office. None of its directors or officers were residents in Michigan during the years 1951-1952.

Plaintiff operated an iron ore department in Cleveland which was under the charge of a vice-president of its company. Local mine offices were established at Ispheming, Michigan, and at Hibbing, Minnesota.

During 1951 and 1952 plaintiff operated a fleet of 23 boats transporting coal from Illinois ports on Lake Michigan and Lake Erie ports outside of Michigan to ports in Michigan, Wisconsin, Minnesota and Canada and, also, transported iron ore, grain and stone from ports in Canada, Minnesota, Wisconsin and Michigan to lower lake ports in Illinois, Indiana, Ohio, New York and Detroit, Michigan. The coal handled, purchased and sold by Cleveland-Cliffs furnished much of the upbound lake cargo for these vessels, and the iron ore mined or purchased by it in Michigan and Minnesota, or purchased by it in Canada, furnished much of the downbound lake cargo for these vessels.

Total shipments of iron ore produced by mines owned or managed by plaintiff amounted to 9,532,939 tons in 1951 and 7,908,320 tons in 1952. In both years approximately 50% was produced from Michigan mines.

Fifty-five% of plaintiff's total sales of iron ore during 1951, and 52% of its total sales for 1952, were made to 5 purchasing customers, namely: Republic Steel Corporation; Jones & Laughlin Steel Corporation; Wheeling Steel Corporation; Inland Steel Company; and Youngstown Sheet & Tube Company.

Plaintiff's ownership of stock in the companies and corporations listed in the paragraph above (and 1 other corporation), during the period from December 31, 1951, to June 30, 1952, was as follows: Follansbee Steel Corporation of Delaware 15 common shares; Inland Steel Company of Delaware 270,-200 common shares; Jones & Laughlin Steel Corporation of Pennsylvania 155,918 common shares; Republic Steel Corporation of New Jersey 307,214 common shares; Wheeling Steel Corporation of Delaware 77,600 common shares; Youngstown Sheet & Tube Company of Ohio 185,500 common shares; and 2,891 preferred shares of Jones & Laughlin Steel Corporation. These stocks were owned, kept and managed as a portfolio of corporate securities and stocks by plaintiff in its Cleveland office.

During the year 1951 Cleveland-Cliffs sold 34,000 shares of Republic Steel Corporation; 7,500 shares of Youngstown Sheet & Tube Company; 10,300 shares of Inland Steel Company; 100 shares of Jones & Laughlin Steel Corporation preferred; and rights with respect to 77,600 shares of Wheeling Steel Corporation common to purchase convertible debentures.

During the year 1952 Cleveland-Cliffs sold 18,-100 shares of stock of Republic Steel Corporation; 5,000 shares of stock of Youngstown Sheet & Tube Company; and rights with respect to 270,200 shares of Inland Steel Company to purchase convertible debentures.

The main question presented is whether the steel stocks above referred to should have been excluded by the commission in the computation of plaintiff's 1952 franchise fee, and on this point the corporation tax appeal board made the following finding of fact:

"That the appellant has an investment portfolio which consists of substantial holdings in steel stocks; * * * that the appellant's investment portfolio,

including its investments in steel stocks for the period in question, was used generally in the appellant's business, including the business activities of the appellant carried on within the State of Michigan; that the record is void of any proof of disassociation of appellant's steel stocks from its business activities in Michigan, with the exception that in the opinion of one of appellant's officers it was not necessary to own the steel stocks for proper disposal of its iron ore in 1951 and 1952, although historically the ownership of steel stocks has been a factor in the sale of iron ore."

The record refutes any claim that plaintiff's ownership of stock in the companies and corporations listed above was necessary to provide a market for plaintiff for the sale of iron ore, as the year in question (1951–1952) was a seller's rather than a purchaser's market, and there was a shortage of iron ore.

The stipulation of facts agreed to by plaintiff and defendant contains the following statement in regard to these steel stocks:

"Cleveland-Cliffs owned, kept and managed at its Cleveland offices a portfolio of corporate securities, a portion of which, consisting of stocks of steel companies (all of which are corporations foreign to Michigan) is listed on exhibit A to exhibit 7 attached to the appeal in this case, which exhibit A is made a part hereof. All records with respect to these securities were kept in Cleveland, and the exercise of voting rights and all other rights under and incidental to these securities was determined by the directors and proper officers of the company acting at the Cleveland office. Respective certificates evidencing these corporate securities were kept in Cleveland. They were not mortgaged or hypothecated or pledged during the periods in question nor at any time since July 9, 1947. All dividends paid on such securities

were paid to Cleveland-Cliffs at its Cleveland offices."

The 1952 dividends on the steel stocks amounted to $3,106,963. It is plaintiff and appellant's contention that the fact that this amount, or any amount obtained by the sale of stocks, was deposited in the bank accounts of plaintiff and then used for payroll and other expense purposes, including capital expenditures in various States including Michigan, does not constitute a legal use of the steel stocks for franchise fee purposes because "there is no necessary and organic connection between the holding of the steel stocks and the operating business of Cleveland-Cliffs. None has been shown and none exists."

It is defendant and appellee's position that the dividends from appellant's steel stock and proceeds from the sale of such stocks were commingled in its general bank account and expended for its activities, both within and without Michigan; that the steel stocks were sold during the period and proceeds were used generally in capital expenditure, both within and without Michigan; that the steel stocks were used for general credit purposes for capital expenditure by appellant generally in its business, both within and without Michigan, and, therefore, "it thus appears  *  *  *  that the findings of fact of the board not only are supported by competent evidence, but constitute the only reasonable analysis of the record."

Plaintiff answers defendant as follows:

"It is stipulated that these steel stocks were not mortgaged, pledged, or hypothecated for the years in question.  *  *  *  If they are security, as appellee argues and the appeal board found—who is the mortgagee, pledgee or lienholder? What type of security interest is vested in whom? How were they

used for credit purposes? It is stipulated that they were not mortgaged, pledged or hypothecated."

The questions plaintiff asks are not answered, and there is nothing in the record to controvert the statement in the stipulation above referred to.

The pertinent portions of the statute (PA 1921, No 85, as amended) are as follows:

"Sec. 4. Every cooperative association and every profit corporation organized or doing business under the laws of this State, or having the privilege to do business, employing capital or persons, owning or managing property or maintaining an office, or engaging in any transaction, in this State, excepting domestic and foreign insurance companies, domestic and foreign building and loan and savings and loan associations, medical care corporations, hospital service corporations, State and national banking corporations, trust companies, and such corporations now in existence or hereinafter incorporated formed with the consent of the banking commissioner for the State of Michigan for the purpose of taking over all or a part of the assets of closed banks or trust companies with the intent and purpose of liquidating such assets when and as conditions warrant such action by said corporations, shall pay, at the time of filing the annual report with the Michigan corporation and securities commission, as required by sections 81 and 82 of Act No 327 of the Public Acts of 1931, being sections 450.81 and 450.82 of the Compiled Laws of 1948, an annual fee of 4 mills upon each dollar of its paid-up capital and surplus, but such franchise fee shall in no case be less than $10.00. * * * It is the intent of this section to impose the tax herein provided for upon every corporation, foreign or domestic, having the privilege of exercising corporate franchises within this State, irrespective of whether any such corporation chooses to actually exercise such privilege during any taxable

period.   The Michigan corporation and securities commission shall in all such cases be authorized to require the corporation to furnish detailed and exact information touching such several matters before making a final determination of the privilege fee to be paid by such corporation.   * * *

"The term 'surplus,' as used in this act, shall be taken and deemed to mean the net value of the corporation's property, less its outstanding indebtedness and paid-up capital; but in no case, either as to domestic or as to foreign corporations, shall any deduction be made from the item of paid-up capital, in computing the franchise fee thereon, by reason of any impairment of the same."   CLS 1952, § 450.304 (Stat Ann 1953 Cum Supp § 21.205).

"Sec. 4b. Every cooperative association and every profit corporation organized or doing business under the laws of this State, having the privilege to do business, employing capital or persons, owning or managing property or maintaining an office, or engaging in any transaction, in this State, principally engaged in the development of mines and mining of iron, copper, silver and other mineral ores within this State, shall at the time of filing its annual report with the Michigan corporation and securities commission, as required by sections 81 and 82 of Act No 327 of the Public Acts of 1931, being sections 450.81 and 450.82 of the Compiled Laws of 1948, pay an annual fee of 4 mills upon each dollar of the fair average value of its issued capital stock for the preceding year ending June 30th.   In estimating the value of capital stock, the surplus and undivided profits shall be included but such fee shall in no case be less than $10.00."   CLS 1956, § 450.304b (Stat Ann 1955 Cum Supp § 21.207).

"Sec. 5. In the case of computing the annual franchise fee prescribed by section 4 of this act, both as to domestic and foreign corporations, such computations shall be made by the Michigan corporation

and securities commission, working in conjunction with the State department of revenue, upon the entire paid-up capital and surplus of any corporation which does not maintain a regular place of business outside this State other than a statutory office. With respect to any other corporation, except for corporations engaged in business as carriers by air, railroad, highway or water, or finance-business, which are separately treated in sections 5a, 5b, 5c and 5d of this act, said annual franchise fee shall be determined by the Michigan corporation and securities commission, working in conjunction with the State department of revenue, and shall be measured by that proportion of its paid-up capital and surplus which proportion shall be obtained by applying the average of the following 3 percentages, separately computed." CLS 1952, § 450.305 (Stat Ann 1953 Cum Supp § 21.208).

"Sec. 5e. If it shall appear on the application of the taxpayer or otherwise that an allocation factor determined pursuant to this act does not properly reflect the activity, business, receipts and capital of a taxpayer reasonably attributable to the State, the commission shall adjust it by:

"(1) Excluding 1 or more of the factors or any component thereof;

"(2) Including 1 or more other factors, such as expenses, purchases, contract values (minus subcontract values);

"(3) Excluding proportionately 1 or more asset items in computing entire paid-up capital and surplus; or

"(4) Applying any other similar method calculated to effect a fair and proper allocation according to the receipts, activity, business and capital reasonably attributable to this State.

"The commission shall promptly publish its rulings with respect to any application of the provisions of this section. Such rulings shall be promulgated in conjunction with the State department of

revenue." CLS 1956, § 450.305e (Stat Ann 1955 Cum Supp § 21.208[5]).

The steel stocks involved in this appeal were also involved in the 1946 intangible tax case which came to this Court on an appeal by the defendant in *Cleveland-Cliffs Iron Company* v. *Department of Revenue,* in 1950, and reported in 329 Mich 225. In that opinion this Court said (pp 235, 240):

"All matters in respect to their ownership and the exercise of rights thereunder were under and subject to the control of the officers and directors of old Cleveland-Cliffs in Cleveland. All dividends paid on these securities were paid to its Cleveland offices. The stock certificates were kept in the vaults of the Union Commerce Bank of Cleveland, Ohio. During 1946 old Cleveland-Cliffs received the dividends and exercised voting rights under these stocks. The certificates were not pledged, mortgaged or hypothecated during 1946. During 1946 some shares of stock in Republic Steel Corporation were sold, and certain shares of Jones & Laughlin stock were exchanged for common stock pursuant to conversion rights. Nothing further was done with these stock certificates in 1946. * * *

"The intangibles sought to be taxed in this case were not used by plaintiff in furtherance of its business in Michigan in 1946 nor otherwise used in Michigan in that year."

Our Court in the 1950 intangible tax case unanimously agreed that the steel stocks could not be taxed because they did not have a situs in Michigan; there was no proof they were used in the corporation's business in Michigan; and further, that said stocks were not situated where the laws or government of this State were available for any aid or protection.

Appellant and appellee are in sharp conflict as to whether our 1950 decision is applicable to the present question. Appellant contends that the 1950 intang-

ible tax decision is controlling and refers to said decision on 29 pages of its brief and on 9 pages of its reply brief.

Appellee answers appellant in this regard as follows:

"Appellant has attempted to rely upon the conclusions reached in the *Cliffs Case, supra,* to support its argument in regard to factual conclusions in this cause. The board found that case not to be of controlling interest here, for we are dealing with an entirely different set of facts and an entirely different taxing situation. * * *

"Appellant relies upon *Cleveland-Cliffs* v. *State of Michigan, supra,* to support the factual conclusion that it is not a unitary enterprise and does not have a commercial domicile here. This case involved the specific intangible property tax and is not in point in reference to the substantive due process question."

The fact that the 1950 decision involved an intangible tax and the present appeal involves a privilege tax does not separate these cases in respect to the operational methods employed by plaintiff and its predecessor. Examination of records and briefs in both cases discloses substantially the same operational methods. We agree with the findings of this Court in its 1950 decision that the operation was not unitary, and find in this present appeal that plaintiff operated several distinct and separate departments or operational divisions and, therefore, was not a unitary corporation but was engaged in a multiform business.

The United States supreme court passed upon the State of North Dakota's right to impose excise taxes by including property outside that State. The Court, in the case of *Wallace* v. *Hines* (1920), 253 US 66, 69, 70 (40 S Ct 435, 64 L ed 782), held:

"The only reason for allowing a State to look beyond its borders when it taxes the property of foreign corporations is that it may get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess.  The purpose is not to expose the heel of the system to a mortal dart—not, in other words, to open to taxation what is not within the State.  Therefore no property of such an interstate road situated elsewhere can be taken into account unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the State.  Hence the possession of bonds secured by mortgage of lands in other States, or of a land grant in another State or of other property that adds to the riches of the corporation but does not affect the North Dakota part of the road is no sufficient ground for the increase of the tax—whatever it may be—whether a tax on property, or, as here, an excise upon doing business in the State."

In *Commonwealth* v. *Columbia Gas & Electric Corporation,* 336 Pa 209, 224 (8 A2d 404, 131 ALR 927), the Pennsylvania supreme court considered a franchise tax, and stated:

"Appellee performs only a part of its functions within the State, and in connection therewith, employs a part of its tangible and some intangible property.  Under the principles relating to corporations engaging in multiform business and considering that only part of appellee's business is conducted in Pennsylvania, as far as the capital stock value is related to tangible and intangible property, only such tangibles and intangibles should be taken into account as are concerned with the functions exercised within the State.  The facts show under appellee's certificate it is permitted to and has actually limited its business to that of a manufacturing or operating company.  The vast amount of its property consists

of intangibles used in connection with its holding company business. The record does not disclose satisfactorily that it performs any part of that business within this State. Its power to act as a holding company is authorized under the laws of Delaware. It is obvious therefore that to include within the taxable measure all the property used in connection with this function would be to levy a franchise tax having no relation to the privilege granted by this State to appellee as an operating company or to any function actually performed herein. Analogies are not lacking to sustain this view that such action would violate constitutional privilege."

The record clearly establishes that plaintiff did not use its steel stocks in its Michigan operations. Defendant does not refute this statement, but counters with the claim that the fact that plaintiff owned said stock must have created for plaintiff a financial background and integrity that made it possible to expand operations in several States, including Michigan, where plaintiff, during the year in question, acquired interest in the Michigan Humboldt mines. Defendant's contention has not been sanctioned by decisions of our Court or of the United States supreme court. This case should be remanded to defendant commission to assess the privilege tax without including in its computation of said tax the steel stocks in question.

Appellant's claims of error, outside of the question above decided, i.e., the taxing of the steel stocks, have been given proper consideration and have been found not to be sustained.

The case should be remanded. No costs, a public question being involved.

Dethmers, C. J., and Carr, J., concurred with Kelly, J.

Smith, J.  The problem before us antedates our statehood. It has not been simplified by the increasing complexities of modern business practices. It relates to a State's jurisdiction to tax a business conducted both within and without its borders.

The corporation before us, the appellant, is an Ohio corporation with its executive offices, its general business and sales offices, and its principal accounting office in Cleveland, Ohio. This corporation, for the years in question, was qualified as a foreign corporation in the States of Illinois, Indiana, Kentucky, Michigan, Minnesota, New York, North Carolina, Pennsylvania, Virginia, West Virginia, Wisconsin, and Tennessee. It operated extensively in this State. Here it owned and operated iron mines which produced approximately 53% of all iron ore shipped by it, from all sources, in 1951. The general manager of all iron mines of the corporation, both in State and out, was located in Ishpeming, Michigan. The major portion of the corporation's iron ore reserves in 1951 and 1952 was located in the Marquette Range in this State. It also dealt in coal on an extensive basis, purchasing from mines in Kentucky, Pennsylvania, Ohio, Virginia, West Virginia, and Illinois, and selling to buyers in many States, including Michigan, in which State it both made deliveries and maintained (in Detroit) a "local sales office." It operated, upon the Great Lakes, an extensive fleet of cargo carrying vessels, by means of which it transported iron ore, grain, and stone from many, including Michigan, ports to other ports, including Detroit. The operations were apparently coordinated. Appellant points out to us that, "The coal handled, purchased and sold by Cleveland-Cliffs furnished much of the upbound lake cargo for these vessels from Lake Erie ports to ports in Michigan, Wisconsin, Minnesota, and Canada, and the iron ore

mined or purchased by it in Michigan and Minnesota or purchased by it in Canada furnished much of the downbound lake cargo for these vessels." It owned what the appeal board described as "vast timber and ore lands" within our borders. It had a land and lumbering department office in Negaunee, Michigan. In addition, we find, from stipulated facts, that on December 31, 1951, the corporation had at least 50% interest in some 11 Michigan corporations, with substantial or minor interests in 3 others, including mining companies, a coal and dock company, a railroad, a chemical company, a power and light company, a hospital, a hotel, and a real-estate company.* What we have here is an extensive economic complex, the activities of which transcend State lines as readily as those of businesses of a simpler day crossed the borders of our townships and counties. It does not appear to us that any of appellant's operations is purely interstate in character. In fact appellant admits in its reply brief, that "The actual 'activities' carried on by Cleveland-Cliffs in Michigan were the mining of iron ore, operation of iron mines, sale of timber, sale of coal and transportation of iron ore and coal on the Great Lakes." It is stipulated that the vessel-operating department operated a fleet which transported "coal from Illinois ports on Lake Michigan and Lake Erie ports outside Michigan to

---

* These corporations are: Arctic Iron Company, Bunker Hill Mining Company, the Lucky Star Mining Company, Marquette Iron Mining Company, Michigan Mineral Land Company, Escanaba Coal & Dock Company, Lake Superior & Ishpeming Railroad, Port Huron Coal & Dock Company, Cliffs Dow Chemical Company, the Cliffs Realty Co., Cliffs Power & Light Company, General Hospital Company, Iron River, Ishpeming Hotel Company, and Superior Realty Company.

The above listing is limited to Michigan corporations and excludes foreign corporations operating here even though appellant owned a 50% or greater stock interest thereof. e.g., The Negaunee Mine Company, an Ohio corporation, 50% of the outstanding stock of which was owned by Cleveland-Cliffs, the balance by Bethlehem Steel Corporation. This is an iron-mining company with properties on the Marquette Range in Michigan.

ports in Michigan, Wisconsin, Minnesota, and Canada and transported iron ore, grain and stone from ports in Canada, Minnesota, Wisconsin, and Michigan to lower lake ports in Illinois, Indiana, Ohio and New York, and to Detroit, Michigan." The appeal board found that "a substantial part of the over-all business activities of the appellant were conducted in the State of Michigan," and that appellant's steel stocks in its investment portfolio "were used for its over-all business, including its Michigan business." For the purposes of the franchise privilege tax here under consideration, and in the light of the facts so found and before us, we approach decision from the point of departure that appellant does a mixed business, both interstate and intrastate, and, hence, we are not concerned with the precedents established for exclusively interstate businesses either under the due process clause, *Alpha Portland Cement Company* v. *Massachusetts,* 268 US 203 (45 S Ct 477, 69 L ed 916, 44 ALR 1219), or the commerce clause, *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 US 422 (67 S Ct 815, 91 L ed 993) ; *Spector Motor Service. Inc.,* v. *O'Connor,* 340 US 602 (71 S Ct 508, 95 L ed 573).

We must advert at the outset, also, to another aspect of appellant's business. The appeal board found that "all of appellant's business activities, though departmentalized,* appear to be otherwise integrated and subject to central supervision, control and management from appellant's officers in Cleveland, Ohio." The board also stated in its "opinion and decision," that "An examination of the briefs on the argument indicates that Cleveland-Cliffs is a unitary business and not a business multiform in character as is argued by the appellant."

---

* Mr. H. Stuart Harrison, vice-president of finance for appellant corporation, testified that the company was set up on the "same decentralized basis as General Motors."

. The tax here under consideration is the annual
corporate franchise fee imposed upon "every coop-
erative association and every profit corporation
organized or doing business under the laws of this
State, or having the privilege to do business  *   *   *
in this State." (CLS 1952, § 450.304 [Stat Ann 1953
Cum Supp § 21.205]). For such privilege it is pro-
vided that a foreign corporation shall pay a fran-
chise fee computed in accordance with an appor-
tionment formula. Different formulae are used for
different corporate activities (*e.g.*, "carriers by air-
craft" formula in section 5a of CLS 1956, § 450.305a
[Stat Ann 1955 Cum Supp § 21.208(1)]; "railroads"
formula in 5b, et cetera). As to the corporation be-
fore us the defendant commission applied the ap-
portionment formula set forth in section 5 of the
act (CLS 1952, § 450.305 [Stat Ann 1953 Cum Supp
§ 21.208]).* This is the apportionment formula gen-

---

* "In the case of computing the annual franchise fee prescribed
by section 4 of this act, both as to domestic and foreign corporations,
such computation shall be made by the Michigan corporation and
securities commission, working in conjunction with the State de-
partment of revenue, upon the entire paid-up capital and surplus
of any corporation which does not maintain a regular place of
business outside this State other than a statutory office. With respect
to any other corporation, except for corporations engaged in business
as carriers by air, railroad, highway or water, or finance-business,
which are separately treated in sections 5a, 5b, 5c and 5d of this
act, said annual franchise fee shall be determined by the Michigan
corporation and securities commission, working in conjunction with
the State department of revenue, and shall be measured by that
proportion of its paid-up capital and surplus which proportion shall
be obtained by applying the average of the following 3 percentages,
separately computed:

"(1) The average value of the taxpayer's real and tangible personal
property within the State during the period covered by its report,
divided by the average value of all the taxpayer's real and tangible
personal property wherever situated during such period: Provided,
That such property value, both within Michigan and everywhere, shall
include a sum equal to 8 times the gross rents paid or accrued per
annum by the taxpayer during the period covered by the tax-
payer's report for the use of real property: Provided, however, That
the value of buildings erected on leased land by or on behalf of the
lessee, shall be included in the taxpayer's real property both within
Michigan and everywhere in the same manner as if owned by the

erally known as the Massachusetts formula, comprising elements of property, payroll, and sales. Each of the factors employed is expressed in fractional form (*e.g.*, local wages over total wages) and the fractions are averaged. Section 5 prescribes that the resultant fraction be then multiplied against the paid-up capital and surplus, to which final figure the tax rate is applied.

Against this background we approach the primary issue in the case. Among the items included in the

taxpayer. 'Gross rents' shall include the entire amount of money or other consideration includable as an expense deduction in the taxpayer's annual statement of profit and loss for the period ending on the date of the taxpayer's report, either directly or indirectly, or for its benefit for the use or possession of real property irrespective of whether such rent be stated as a fixed sum of money, a percentage of sales, profits or otherwise, and shall include any amount paid or accrued as interest, taxes, insurance or any other item of expense to the taxpayer pursuant to its use of real property belonging to another, but shall not include depreciation or amortization on buildings erected on leased land by the taxpayer or amounts separately billed for utility service, whether billed by the lessor or another.

"(2) The total wages, salaries and other personal service compensation during such period, computed on the cash or accrual basis according to the method used for Federal tax purposes, of officers and employees within the State divided by the total wages, salaries and other personal service compensation, similarly computed, during such period of all the taxpayer's officers and employees within and without the State.

"(3) The receipts of the taxpayer, similarly computed, arising during such period from:

"(a) Sales of its tangible personal property located within this State at the time of the receipt of or appropriation to the orders where shipments are made to points within this State;

"(b) Sales of tangible personal property located within this State at the time of the receipt of or appropriation to the orders where shipment is made to points outside of the State and sales of tangible personal property located without the State at the time of receipt of or appropriation to the orders where shipment is made to points within the State, but only to the extent of 50 per centum of the receipts from the sales referred to in this subdivision (b); and

"(c) Sales of any such property not located at the time of the receipt of or appropriation to the orders at any permanent or continuous place of business maintained by the taxpayer without the State, where the orders were received or accepted within the State, but only to the extent of 50 per centum of the receipts from the sales referred to in this subdivision (c). For the purpose of this subdivision (c), an order shall be deemed received or accepted within the State if it has been received or accepted by an employee, agent,

capital and surplus of appellant corporation, upon which the franchise fee was based, were certain steel stocks owned by appellant, the average book value of which was in excess of $27,000,000.* They comprised some 27% of the company's total assets. It is the position of the corporation that these steel stocks should be excluded from its assets in determining its book value net worth, thus substantially lowering its tax. "These securities," it asserts, "do not form an integral part of the activities of Cleveland-Cliffs in Michigan and, therefore, allocating a portion of their value to Michigan, in the method

agency or independent contractor chiefly situated at, connected with, by contract or otherwise, or sent out from a permanent or continuous place of business of the taxpayer within the State;

"(d) Services performed within the State;

"(e) Rentals from property situated, and royalties from the use of patents or copyrights, within the State; divided by the total amount of the corporation's receipts, similarly computed, arising during such period from all sales of its tangible personal property, services performed, and rentals and royalties, within and without the State: Provided, however, That the fee so determined shall in no event be less than the fee any such corporation shall have paid for the privilege of doing business in this State for the year 1951, unless such corporation shall have decreased its outstanding capital stock since December 31, 1951."

* The steel stocks which Cleveland-Cliffs owned on December 31, 1951, and June 30, 1952, and which were included in its capital and surplus upon which the franchise fee was based are as follows:

| Name of Company | State of Incorporation | Dec. 31, 1951 Common | Preferred |
|---|---|---|---|
| Follansbee Steel Corporation | Delaware | 15 | |
| Inland Steel Company | Delaware | 270,200 | |
| Jones & Laughlin Steel Corporation | Pennsylvania | 155,918 | 2,891 |
| Republic Steel Corporation | New Jersey | 307,214 | |
| Wheeling Steel Corporation | Delaware | 77,600 | |
| Youngstown Sheet & Tube Company | Ohio | 185,500 | |

Inland Steel Company is a Delaware corporation engaged in the production of steel, pig iron, coke and related products. Its principal manufacturing plants are in Indiana and Illinois. It was the eighth largest steel producer in the nation.

Jones & Laughlin Steel Corporation is a Pennsylvania corporation engaged in the manufacture of steel, pig iron, coke and related products with its principal plants in Pennsylvania and Ohio. It is the fourth largest steel producer in the nation.

adopted by the commission, does not properly reflect the activity, business, receipts and capital of Cleveland-Cliffs reasonably attributable to Michigan but rather, on this point, insofar as it allocates a portion of their value to Michigan, distorts such activities." Failure to make such exclusion, appellant asserts, denies it due process and equal protection of the laws in violation of the Constitutions of Michigan (1908) (art 2, §§ 1 and 16) and of the United States (Amendment 14) and violates the commerce clause of the Constitution of the United States (art 1, § 8).

The facts with respect to these controverted securities were found by the corporation tax appeal board as follows:

"11. That the appellant's investment portfolio, including its investments in steel stocks for the period in question, was used generally in the appellant's business, including the business activities of the appellant carried on within the State of Michigan.

"12. That the record is void of any proof of disassociation of appellant's steel stocks from its business activities in Michigan, with the exception that in the opinion of one of appellant's officers it was not necessary to own the steel stocks for proper dis-

Republic Steel Corporation is a New Jersey corporation engaged generally in the production of steel, pig iron, coke and related products. It is the third largest steel producer in the United States. Its principal manufacturing plants are in Ohio and States other than Michigan.

Wheeling Steel Corporation is a Delaware corporation engaged in the production of steel, pig iron, coke and related products. Its principal manufacturing plants are in West Virginia and Ohio. It is a large steel producer.

Youngstown Sheet & Tube Company is an Ohio corporation engaged in the manufacture of steel, pig iron, coke and related products, with its principal plants in Ohio. It was the seventh largest steel producer in the nation.

It held the same stocks on June 30, 1952, except for Republic Steel, which was then 305,214 shares of common stock.

.posal of its iron ore in 1951 and 1952, although historically the ownership of steel stocks has been a factor in the sale of iron ore.

"13. That the appellant's steel stocks in its investment portfolio were used for its over-all business, including its Michigan business, in the following specific particulars in 1951–1952: as an asset for general credit purposes; by using the dividend income that went into the general corporate account as working capital; by sales and use of the proceeds of the sales for the years 1951 and 1952 as part of working capital; and by the use of the sale proceeds and dividend income for various capital outlays, including the acquisition of 50% interest in the Humboldt Mines in Michigan, and the investment in Michigan in additional mining equipment and development regarding low-grade ores."

These findings are binding upon us if supported by competent evidence. *Chicago, Duluth & Georgian Bay Transit Co.* v. *Corporation & Securities Commission,* 319 Mich 14. In view of appellant's challenges thereto we will examine in detail the record with respect to the principal conclusions in the findings made. Thus the board found that the appellant's steel stocks were used for over-all business purposes (including its Michigan business) in that the proceeds of sales of such stocks in 1951–1952 were employed as part of the working capital, that the dividend income from the stocks went into the general corporate account as working capital, and that (specifically as to Michigan) these sales and dividend proceeds were used, in part, in "the acquisition of 50% interest in the Humboldt Mines in Michigan, and the investment in Michigan in additional mining equipment and development regarding low-grade ores." As to the source and disbursement of funds for capital outlays we go to the record. Exhibits 8 and 9 (appellant's annual reports for the

years 1951 and 1952) reveal that in 1951–1952 the corporation received approximately $3,478,000 from the sale of steel stocks which receipts helped "pay for our capital expenditure program."* Portions of the capital expenditure program were a housing project for company employees in Ishpeming, Michigan, "working out metallurgical processes for the beneficiation of similar iron formation in Michigan called jasper," the "development of ore mining properties" in Michigan, and at a cost of approxi-

* Testimony of appellant's witness Harrison with respect to the consolidation of old Cleveland-Cliffs with the Cliffs Corporation makes clear the contemplated use of the steel stocks now under examination. He stated:

"Now, we had 2 possibilities. One is, we could consolidate the 2 companies together; and the other is, we could have dissolved Cliffs Corporation.

"From the point of view of Cleveland-Cliffs' thinking, we thought it would be more attractive to consolidate the 2 companies together if we could effect a fair merger on both sides, because these steel stocks, in addition to being a very sound investment in our estimation, could also be used as a primary source of funds for capital expenditures or for retirement of preferred or debt, and so we worked to get the consolidation."

Consistent with the above is the statement in exhibit 8, the 1951 report, that "Of the total funds required for the program, it is estimated that $23,000,000 has been or will be obtained through borrowings. The remainder is expected to come from internal sources, including earnings, depreciation and depletion and the sale of steel stocks."

The 1952 report, exhibit 9, states, in part, as to finances that—

"The capital expenditure program since 1945 has been financed principally from internal sources, either retained earnings or funds generated from depreciation, depletion, and amortization, and to some extent through the sale of steel stocks. It has also been partly financed by loans from outside sources. * * *

"During the year we obtained $1,078,000 through the sale of steel stocks in order to help pay for our capital expenditure program. * * *

"Dividends received from steel stocks during 1952 amounted to $3,106,963 compared with $3,345,513 in 1951. Steel stock dividends during the year remained remarkably steady in view of the long steel strike. All but 1 company represented in our steel investment portfolio paid the same rate as they did in 1951."

The exhibit describes, in addition, the opening of 2 low-grade iron ore properties in Michigan, the development of the Ohio Mine in the western part of the Marquette Range, as well as other activities in this State.

mately $2,000,000, a provision for a second steam plant for the Cliffs Power & Light Company, a wholly-owned subsidiary in the Upper Peninsula of the State. Between December 31, 1951, and June 30, 1952, appellant also acquired a 50% interest in the Humboldt Mining Company, a Michigan corporation, having property in the Marquette Range, in Michigan, as well as a 31.93% interest in the stock of the Bunker Hill Mining Company, a Michigan corporation with iron ore properties in this State. Dividends, moreover, to the extent of something over $6,000,000 were received from the steel stocks in 1951 and 1952, all of which were commingled with the company's regular cash accounts and, hence, became, at least for the time being, a part of its working capital and total current assets.*

---

* The testimony of Mr. Harrison is revealing as to the position of the steel stocks, and dividends therefrom, in the financial structure of appellant:

"*Q.* May I ask you this: You have made the flat statement that the steel stock investment has no connection with any of the other business of Cleveland-Cliffs. What happens to the income from that business, as treasurer and vice-president, you do know, don't you?

"*A.* You mean the dividends that we receive from the stock?

"*Q.* Yes, the dividends.

"*A.* The dividends go into our regular cash accounts.

"*Q.* In other words, they become part of your total current assets?

"*A.* Temporarily, at least, yes.

"*Q.* The dividends, then, would you say are used as working capital of Cleveland-Cliffs Corporation?

"*A.* No, not necessarily. We use the dividends, for one thing, to pay dividends, so they would go right out. * * *

"*Q.* (By Mr. Dexter, interposing): In other words, what do you mean, then, when you say they are not connected with Cleveland-Cliffs' business? How would you connect an investment, Mr. Harrison, as an expert, how would you connect it with the business, say, of manufacturing automobiles—an investment portfolio?

"*Mr. Loomis:* Just a minute. I object to the question of getting into the automobile business. That has nothing to do with this case.

"*Mr. Dexter:* He has qualified himself as an expert witness. He has definitely testified as to a conclusion, and this is on cross-examination. What does he mean when he says there is no connection?

"*Chairman Gilmore:* That is a good question.

"*Mr. Loomis:* As to this case?

"*Mr. Dexter:* Yes.

"*Q.* (By Mr. Dexter): As to this case, what do you mean?

It is our opinion that the factual findings of the board, as hereinabove set forth, are amply justified on the record before us. The interrelationship between appellant's steel stocks and its over-all business, including its operations in Michigan, is clear and clearly established.

That such stocks be denominated "investments" does not aid appellant. The observations of the supreme court of the United States in *Flint* v. *Stone Tracy Company*, 220 US 107, 166 (31 S Ct 342, 55 L ed 389, Ann Cas 1912B, 1312), on the relationship of investments to business done are particularly appropriate at this point:

"Nor can it be justly said that investments have no real relation to the business transacted by a corporation. The possession of large assets is a business advantage of great value; it may give credit which will result in more economical business methods; it may give a standing which shall facilitate purchases; it may enable the corporation to enlarge the field of its activities and in many ways give it business standing and prestige."

It has been our consistent holding that the Michigan corporate franchise fee is a tax imposed upon the privilege of doing business within this State in a corporate capacity. As we held in *In re Detroit International Bridge Company*, 257 Mich 52, 59

---

"*A.* I mean that our holdings, the steel stocks, didn't help us sell one pound of ore in 1951 or 1952.

"*Mr. Targonski:* That again is your conclusion.

"*Q.* (By Mr. Dexter): That is your conclusion?

"*A.* That is my conclusion.

"*Q.* But, in other words, when you say it has no connection, you mean that it just didn't help you sell ore?

"*A.* Yes, that is correct.

"*Q.* You did not mean that it did not help the over-all business of Cleveland-Cliffs Corporation?

"*A.* It helps our earnings, certainly. No question about that.

"*Q.* Does earnings help Cleveland-Cliffs' business?

"*A.* Sure."

(aff'd, *Detroit International Bridge Co.* v. *Corporation Tax Appeal Board of Michigan,* 287 US 295 [53 S Ct 137, 77 L ed 314]):

"We are impressed that in the discussion of this matter counsel lose sight of the nature of the privilege fee sought to be collected. It is not a tax upon the proceeds of the business of the corporation. It in no way involves the tolls collected from those using the bridge as a means of transportation between Detroit and Canada. It is a fee imposed by law 'for the privilege of exercising its franchise and of transacting its business within this State.' The distinction between such a fee and a tax upon property was clearly pointed out in *Union Steam Pump Sales Co.* v. *Secretary of State,* 216 Mich 261, and later in *In re Truscon Steel Co.,* 246 Mich 174, and in *In re G. H. Hammond Co.,* 246 Mich 179. The question presented is so clearly disposed of in *In re Detroit & Windsor Ferry Co.,* 232 Mich 574, that further discussion seems unnecessary."

With respect to this tax the legislature does not purport to tax any specific asset, tangible or intangible, out-State or in-State. It does not impose a tax upon steel stocks, or upon appellant's Minnesota mining properties, its fleet of vessels, its "vast" timber and ore lands, or any other specific property. What it says to the foreign corporation, simply put, is this: You are conducting activities within our borders for which we levy a franchise tax. We measure your local activities by a fair apportionment of your total value as a going concern.

Such result is what our apportionment formulae seek to achieve. And that there is no mistake as to the good faith effort of the State to achieve only a reasonable, not an arbitrary, or confiscatory result, section 5e* has been written into the act, giving the

---

* "Sec. 5e. If it shall appear on the application of the taxpayer or otherwise that an allocation factor determined pursuant to this

administrative body, charged with primary responsibility, ample authority to correct inequities.

- It is at this point that appellant's misreliance upon what is referred to in the record (and which terminology we adopt) as the "old Cleveland-Cliffs case," becomes most clear. The old case, *Cleveland-Cliffs Iron Company* v. *Department of Revenue,* 329 Mich 225, involved appellant's predecessor corporation. (The Cleveland-Cliffs Corporation now before us was formed by the consolidation, on July 9, 1947, of the Cleveland-Cliffs Iron Company, an Ohio corporation, "old Cleveland-Cliffs," and the Cliffs Corporation, an Ohio corporation.) The old *Cleveland-Cliffs Case* involved the application of our intangible tax law to all of the intangible property owned by the predecessor corporation, an apportionment formula being used to determine "the percentage of taxability of intangible personal property owned by a person having his domicile outside of this State but used in connection with or acquired from the conduct of his business both within and outside the State of Michigan." PA 1939, No 301, as amended by PA 1945, No 165 (CL 1948, § 205.131 *et seq.* [Stat Ann 1947 Cum Supp § 7.556(1) *et seq.*]). It is not material to our question whether

---

act does not properly reflect the activity, business, receipts and capital of a taxpayer reasonably attributable to the State, the commission shall adjust it by:

"(1) Excluding 1 or more of the factors or any component thereof;

"(2) Including 1 or more other factors, such as expenses, purchases, contract values (minus subcontract values);

"(3) Excluding proportionately 1 or more asset items in computing entire paid-up capital and surplus; or

"(4) Applying any other similar method calculated to effect a fair and proper allocation according to the receipts, activity, business and capital reasonably attributable to this State.

"The commission shall promptly publish its rulings with respect to any application of the provisions of this section. Such rulings shall be promulgated in conjunction with the State department of revenue." CLS 1956, § 450.305e (Stat Ann 1955 Cum Supp § 21.208 [5]).

such intangibles included substantially the same steel stocks as are now before us. We there held, per REID, J., that section 1(c) and section 12* (quoted above in part) of the intangibles statute in question were (p 246) "invalid and void under the circumstances of this case so far as concerns taxation of such of the intangibles of plaintiff as do not have an actual situs in Michigan," and, further (p 242), that "The business of plaintiff in 1946 was not unitary in the sense in which that word is used in" *Bass, Ratcliff & Gretton, Limited,* v. *State Tax Commission,* 266 US 271 (45 S Ct 82, 69 L ed 282), and *Adams Express Company* v. *Ohio State Auditor* (*Sanford* v. *Poe*), 165 US 194, 222 (17 S Ct 305, 41 L ed 683).

But we are not, with respect to the statute now before us, concerned with the "taxation of such of the intangibles of plaintiff" (or the tangibles) as either do or do not have an actual situs in Michigan, are or are not used here, or were or were not acquired here. We are taxing the privilege of carrying on intrastate activities. It is thus completely pointless for plaintiff to argue that when it came into this State it "did not apply for admission to the State of Michigan with respect to holding investments in steel stocks." Nor did it, specifically, with respect to its iron ore holdings in Minnesota, or to its office furniture in Cleveland. But we are not taxing these things. We are taxing the value of the exercise of a privilege in this State and we ascertain that value through the application of property, payroll, and sales factors to the fair average stock value or the paid-up capital and surplus. Likewise with reference to the old *Cleveland-Cliffs Case,* we need not now affirm or reject our holding as to the unitary nature of plaintiff's busi-

---

* See CL 1948, § 205.142 (Stat Ann 1950 Rev § 7.566[12]).—RE-PORTER.

ness in 1946 for the purpose of the application of
the statute then under consideration, and on the
facts then before us.  Suffice to say that on the rec-
ord now presented we would not hesitate to charac-
terize the plaintiff's business as unitary were the
issue here controlling.  We cannot reconcile the
obviously well-coordinated operations of the various
departments (*e.g.,* the vessels of its vessel-operating
department carrying coal under the jurisdiction of
the coal department as their upbound lake cargo,
and the iron ore of the ore department as their down-
bound lake cargo) with appellant's insistence that it
is not a unitary enterprise, not an organic or func-
tional whole, the various departments of which de-
rive economic strength and power from its central-
ized supervision, management and control.

A similar argument was made by the Ford Motor
Company in *Commonwealth* v. *Ford Motor Com-
pany,* 350 Pa 236, 244 (38 A2d 329), wherein it was
asserted that it performed 4 distinct corporate
functions, purchase of raw materials, manufacture
of steel, glass, and other products, from raw ma-
terials, assembly of finished automobiles, and sales
and service thereof, and that only the latter 2 func-
tions were conducted in Pennsylvania.  The court's
analysis of the situation in rejecting the argument is
equally applicable here:

"The fact that appellant's structure is vast and
complex does not, as we have said, obscure its uni-
tary nature.  True, as appellant contends, one or
more of the phases of its complete activity might
have been separated from the others and conducted
apart from them.  The company could, for example,
cease to produce its own raw products and purchase
these materials from outside sources.  It might have
resorted to financial institutions for loans to pur-
chase materials, thereby reducing its working cap-

ital. It might have ended the process of manufacture
short of assembly, or, as appellant suggests, limited
its activities to the assembly of automobiles from
finished parts fabricated by other corporations,
*It did, however, none of these things.* It has pre-
ferred to establish a great, cohesive empire of indus-
try, through which it may control every phase and
every step of the manufacture and sale of its prod-
ucts."

So far as the question of the unitary nature of the
corporation is concerned, the conclusion of the ap-
peal board that Cleveland-Cliffs is a unitary busi-
ness is well sustained upon the record, the various
elements thereof, including its physical and intangi-
ble assets, forming part of a functional and organic
whole.

It should be observed, however, that the unitary
concept does not here control.* This is primarily
for the reason that each of the departments of the
appellant conducted a portion of its operations in
this State. If, for example, its mining operations
were all conducted without the borders of this State
(as were, allegedly, all of Ford's manufacture of
steel, glass, and cement, in *Commonwealth* v. *Ford
Motor Company, supra*), then the functional rela-
tion of such operations to the business done in Michi-
gan would be a vital question. But in the case be-
fore us appellant concedes that "the actual 'activ-

* This is, in fact, conceded by appellant as we read the following
paragraph of its supplemental brief:

"Actually, the question asked by the Court was whether or not
the question of unitary corporation was *controlling* in the instant
case. The answer of Cleveland-Cliffs was that it was not controlling.
We pointed out in our original brief that even though Cleveland-Cliffs
were held to be a unitary corporation, which would be squarely con-
trary to the old *Cleveland-Cliffs Case*, the steel stocks would still have
to be excluded because they were not used in or connected with any
business carried on in Michigan and did not give value to the franchise
to do business in Michigan, citing *Fargo* v. *Hart* (1904), 193 US 490
(24 S Ct 498, 48 L ed 761); and *Wallace* v. *Hines* (1920), 253 US 66
(40 S Ct 435, 64 L ed 782), both cases involving unitary corporations."

ities' carried on by Cleveland-Cliffs in Michigan
were the mining of iron ore, operations of iron mines,
sale of timber, sale of coal and transportation of
iron ore and coal on the Great Lakes." The fact, if
it is a fact, that the various departments might con-
ceivably be split up and operated as separate busi-
nesses answers nothing. Our problem involves
present operations, not speculative split-ups.

As to the constitutional objections made, we recog-
nize that there cannot be a sharp differentiation
(save as matter of verbiage) between the due process
and commerce clause arguments. There are areas
of overlap. Nevertheless, clarity of thought may be
aided by a rough separation of the problems. Put
with considerable oversimplification, and yet essen-
tially accurately, our problem in the due process area
is one of legislative jurisdiction. We look to see
whether or not the State has reached out beyond its
territorial limits, with respect either to property or
activities, in the exercise of its taxing power. The
problem is one of nexus, or whether we have "a suf-
ficiently substantial and close connection with the
transaction, whether by virtue of tax benefits con-
ferred in general police protection and otherwise or
on account of ideas of territorial sovereignty con-
cerning occurrence of 'taxable incidents' within its
borders, to furnish the due process foundation neces-
sary to sustain the exercise of its taxing power."
Rutledge, J., concurring in *International Harvester
Co.* v. *Department of Treasury,* 322 US 340, 356 (64
S Ct 1019, 1030, 88 L ed 1313). As expressed by Mr.
Justice Frankfurter (*Wisconsin* v. *J. C. Penney Co.,*
311 US 435, 444 [61 S Ct 246, 85 L ed 267, 130 ALR
1229]), "The simple but controlling question is

whether the State has given anything for which it can ask return."

Within our jurisdiction the appellant operates extensively in all of its various departments. Here it is the beneficiary of our public institutions. It is guarded by our public officers. Here it shares with our natural citizens the solicitude of our courts, and it enjoys, in common with all, those networks of transportation and communication without which the complex could not, on its present scale, exist. Is the Michigan journey to be a free ride? We are assured not. "It has often been recognized that 'even interstate business must pay its way' by bearing its share of local tax burdens."* What, however, is the fare to be?

We take as a starting point the principle that a franchise tax "need not be based solely on the amount of business done or property owned within the State * * * so long as it bears some real and reasonable relation to the privilege granted or to the protection of the interests of the State." *New York* v. *Latrobe,* 279 US 421, 427 (49 S Ct 377, 73 L ed 776, 65 ALR 1341). In this "real and reasonable relation" required is the substance of our problem. The foreign corporation, by hypothesis, has property elsewhere. Yet due process prevents our taking beyond our jurisdiction, *Farmer's Loan & Trust Co.* v. *Minnesota,* 280 US 204 (50 S Ct 98, 74 L ed 371, 65 ALR 1000); *Great Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 US 412 (57 S Ct 772, 81 L ed 1193, 112 ALR 293). Nevertheless, the privileges here enjoyed have a real value. The duty of the State at this point does not go beyond that of making a fair

---

* *Gwin, White & Prince, Inc.,* v. *Hennefore,* 305 US 434, 438 (59 S Ct 325, 83 L ed 272). As to its constitutional channel, for an exclusively interstate business, see *Spector Motor Service, Inc.,* v. *O'Connor,* 340 US 602 (71 S Ct 508, 95 L ed 573).

apportionment, for we take it as settled that, in imposing a privilege tax upon a foreign corporation doing a mixed business, a State does not offend due process by including, as here, in its tax formula, either as to measure or base, the value of capital stock employed by the foreign corporation in its over-all business, provided only that the tax paid by the corporation be reasonably apportioned to the privileges enjoyed by it in the taxing State. These principles were clearly stated by the circuit court of appeals of the fifth circuit, in *Southern Realty Corporation* v. *McCallum,* 65 F2d 934, in which case the court passed upon the validity of a privilege tax graduated according to the capital stock of the corporation. The court held, in part (p 936) :

"The original form, and location of that capital, whether in or out of the State, is unimportant, provided it is to contribute to the corporation's business power within the State. When the corporation is to do business in other States also, avoidance of a trespass on interstate commerce or on that done beyond the territorial jurisdiction of the taxing State is secured by apportioning the business potency of the corporation represented by its business capital according to the business actually done during the preceding calendar year in the taxing State as indicated by gross receipts, compared with all its business everywhere. * * * That a State may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business or by its income therefrom, although business is done in more States than one, without unconstitutional interference with interstate commerce or other Federal prerogative and without a taxing of property beyond the jurisdiction of the taxing State, when the capital by which the tax is measured is reasonably apportioned according

to the business there done, is settled by many decisions."

Likewise in *Butler Brothers* v. *McColgan,* 315 US 501. 506, 507 (62 S Ct 701, 86 L ed 991), the court held:

"We read the statute as calling for a method of allocation which is 'fairly calculated' to assign to California that portion of the net income 'reasonably attributable' to the business done there. The test, not here challenged, which has been reflected in prior decisions of this court, is certainly not more exacting. *Bass, Ratcliff & Gretton, Limited,* v. *State Tax Commission,* 266 US 271 (45 S Ct 82, 69 L ed 282); *Ford Motor Co.* v. *Beauchamp,* 308 US 331 (60 S Ct 273, 84 L ed 304). Hence, if the formula which was employed meets those standards, any constitutional question arising under the Fourteenth Amendment is at an end."

Here, then, we have an organic corporate unit under centralized executive control and management, doing business, in each of its several departments, within the jurisdiction, subject to taxation through a commonly-employed apportionment formula which makes an obvious effort to accomplish a just, equitable and reasonable division of the intrastate and interstate aspects of a complex business operation. The crucial question at this point relates to the result reached: Is it reasonable, under the circumstances, that the taxing State exact this particular payment from this particular corporation under these particular circumstances? *Bass, Ratcliff & Gretton, Limited,* v. *State Tax Commission,* 266 US 271 (45 S Ct 82, 69 L ed 282). No form of words more precise will serve. The problem cannot be solved by black-letter rule. "So far as due process is concerned the only question is whether the tax in

·practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State.  \*  \*  \*  Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State." Douglas, J., in *Ott* v. *Mississippi Valley Barge Line Co.,* 336 US 169, 174 (69 S Ct 432, 93 L ed 585).

The appellant's privilege fee as determined by the board was in the amount of $114,236.14, resulting from an apportionment of $28,520,392.37 of appellant's net worth of $81,497,546.44 to this State. We think it pertinent to observe at this point that the record before us is barren of any showing, or, in fact, any claim by appellant, that this apportionment of approximately 34% of appellant's paid-up capital and surplus or fair average value of its capital stock as a measure of the privileges granted it by this State was unreasonable or worked a gross inequity under the circumstances herein presented. We agree with the holding in *Butler Brothers* v. *McColgan, supra,* 507, that, "One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent evidence' that it results in extraterritorial values being taxed." Significant, also, on this phase of the case is the holding in *Bass, Ratcliff & Gretton, Limited,* v. *State Tax Commission, supra,* 281, 282, that:

"The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State. 'The plaintiff's argument on this branch of the case,' as stated by the supreme court of errors, 'carries the burden of

showing that 47% of its net income is not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which 80% of its gross earnings was derived after paying manufacturing costs.' The corporation has not even attempted to show this; and for aught that appears the percentage of net profits earned in Connecticut may have been much larger than 47%. There is, consequently, nothing in this record to show that the method of apportionment adopted by the State was inherently arbitrary, or that its application to this corporation produced an unreasonable result."

It is our conclusion, so far as due process is concerned, that the tax here involved bears a real and reasonable relation to the privilege granted. *New York* v. *Latrobe, supra.*

Much of what has been said heretofore with respect to the due process clause is equally applicable to the problems presented by the commerce clause, as it is, indeed, to the problems of constitutional equality. Nevertheless there is a difference in emphasis. The commerce clause is, as a factual and economic matter, concerned with impediments to the free flow of commerce between the States. These may, of course, arise from a rapacious extra-jurisdictional levy by a taxing State, but obstruction equally effective may result from an exorbitant taxation by a taxing State having ample jurisdiction as a matter of due process, as well as by a more modest tax capable of use so cumulative as to be destructive.

The commerce clause problem is this: Has this State, in imposing this tax, unduly burdened interstate commerce? What is a "burden" as the term is here employed? When is the burden "undue"? In answering these inquiries the older cases employed a simple direct-indirect dichotomy.* If the tax bore

---

* Compare *Crew Levick Co.* v. *Pennsylvania*, 245 US 292 (38 S Ct 126, 62 L ed 295), with *American Manufacturing Co.* v. *St. Louis*, 250 US 459 (39 S Ct 522, 63 L ed 1084).

directly upon interstate commerce it was forbidden. If its impact were only remote, or indirect, it was upheld. In later years we saw the emergence of the multiple burdens theory (*Western Live Stock* v. *Bureau of Revenue,* 303 US 250 [58 S Ct 546, 82 L ed 823, 115 ALR 944]), though more recent decisions (*e.g., Freeman* v. *Hewit,* 329 US 249 [67 S Ct 274, 91 L ed 265]) cast serious question upon its present utility,* suggesting, in the language of the astronomer, that we may have been viewing a nova. The problem is complicated further by the fact that differing taxes often involve entirely dissimilar considerations and result in differing impacts upon the economy.† In addition, those cases involving business exclusively interstate in character (*e.g., Spector Motor Service* v. *O'Connor, supra*) present unique and difficult problems not here presented to us. Here we are dealing with an organic and functional entity (thus distinguishing such cases as *Commonwealth* v. *Columbia Gas & Electric Corp.,* 336 Pa 209 [8 A2d 404, 131 ALR 927]), doing a mixed interstate and intrastate business, involving in this State substantial activities. Does the privilege tax here imposed offend the commerce clause? We turn to *Nashville, C. & St. L. Ry.* v. *Browning,* 310 US 362, 365 (60 S Ct 968, 84 L ed 1254), for our starting point:

"The guiding principles for adjustment of the State's right to secure its revenues and the nation's

* The literature is voluminous. See Powell, More Ado About Gross Receipts Taxes, 60 Harv L Rev 501, 710; Barrett, "Substance" *v.* "Form" In the Application of the Commerce Clause to State Taxation, 101 U of Pa L Rev 740.

† The adequacy of the judicial (as opposed to the legislative) remedy may, in fact, be open to serious question. See dissenting opinions of Mr. Justice Black in *Gwin, White & Prince, Inc.,* v. *Henneford,* 305 US 434, 442 (59 S Ct 325, 83 L ed 272), and *Adams Manfg. Co.* v. *Storen,* 304 US 307, 316 (58 S Ct 913, 82 L ed 1365, 117 ALR 429).

duty to protect interstate transportation are by this time well settled. The problem to be solved is what portion of an interstate organism may appropriately be attributed to each of the various States in which it functions. Basic to the accommodation of these conflicting State and national interests is realization that by its very nature the problem is incapable of precise and arithmetical solution. In tapping these common sources of revenue a State cannot, we have held, use a fiscal formula, whatever may be its appearance of certitude, to project the taxing power of the State plainly beyond its borders."

In the light of the principles hereinabove, we refer again to the fact that the tax here under consideration does not attempt to impose a tax upon appellant's capital stock, or, in fact, any of the assets (or investments) going to make up in part the value of such stock or its paid-up capital and surplus. Rather, it uses a percentage of issued capital stock, or paid-up capital and surplus,* to measure appellant's corporate franchise fee, thus attempting, by formula, to arrive at a reasonable approximation of the value of the business done in Michigan. In this respect it is similar to *Ford Motor Co.* v. *Beauchamp*, 308 US 331 (60 S Ct 273, 84 L ed 304), involving a franchise tax measured by a proportion of the outstanding capital stock, surplus and undivided profits of the corporation. In holding the tax valid, the court spoke, in part, as follows (pp 334–336):

"The statute calls the excise a franchise tax. It is obviously payment for the privilege of carrying on

---

. * Section 4 of the act refers to "paid-up capital and surplus" and section 4b to "fair average value of its issued capital stock." The dollar difference between the 2 values is insignificant. The board applied section 4 (CLS 1952, § 450.304, Stat Ann 1953 Cum Supp § 21.205).

business in Texas. There is no question but that the State has the power to make a charge against domestic or foreign corporations for the opportunity to transact this intrastate business. The exploitation by foreign corporations of intrastate opportunities under the protection and encouragement of local government offers a basis for taxation as unrestricted as that for domestic corporations. In laying a local privilege tax, the State sovereignty may place a charge upon that privilege for the protection afforded. When that charge, as here, is based upon the proportion of the capital employed in Texas, calculated by the percentage of sales which are within the State, no provision of the Federal Constitution is violated. *  *  *

"In a unitary enterprise, property outside the State, when correlated in use with property within the State, necessarily affects the worth of the privilege within the State. Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the State the managers of the business may determine. For this reason it is held that an entrance fee may be properly measured by capital wherever located. The weight, in determining the value of the intrastate privilege, given the property beyond the State boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing State."

Similar in principle is the case of *International Harvester Co.* v. *Evatt,* 329 US 416 (67 S Ct 444, 91 L ed 390). In this case, also, a percentage (determined by the Ohio property and business done) of the value of the capital stock was employed as the tax base. In rejecting allegations that the due process clause and commerce clauses had been violated, the court held, in part, as follows (pp 419–422):

"A part of the measure of the tax is consequently an amount equal to the sales price of Ohio-manufactured goods sold and delivered to customers in other States. Appellant contends that the State has thus taxed sales made outside of Ohio in violation of the due process clause. A complete answer to this due process contention is that Ohio did not tax these sales. Its statute imposed the franchise tax for the privilege of doing business in Ohio for profit. * * *

"Of course, the commerce clause does not bar a State from imposing a tax based on the value of the privilege to do an intrastate business merely because it also does an interstate business. *Ford Motor Co.* v. *Beauchamp,* 308 US 331, 336 (60 S Ct 273, 84 L ed 304). Nor does the fact that a computation such as that under Ohio's law includes receipts from interstate sales affect the validity of a fair apportionment. See, *e.g., Hump Hairpin Manfg. Co.* v. *Emmerson,* 258 US 290 (42 S Ct 305, 66 L ed 622); *Underwood Typewriter Co.* v. *Chamberlain,* 254 US 113 (41 S Ct 45, 65 L ed 165); *American Manfg. Co.* v. *St. Louis,* 250 US 459 (39 S Ct 522, 63 L ed 1084); *International Shoe Co.* v. *Shartel,* 279 US 429, 433 (49 S Ct 380, 73 L ed 781); *Western Cartridge Co.* v. *Emmerson,* 281 US 511 (50 S Ct 383, 74 L ed 1004). And here, it clearly appears from the background of Ohio's tax legislation that the whole purpose of the State formula was to arrive, without undue complication, at a fair conclusion as to what was the value of the intrastate business for which its franchise was granted."

We also note the differentiation made in the *Spector Case, supra,* in which the court, holding that a Connecticut excise could not be imposed upon the foreign corporation there involved, doing an exclusive interstate business, said (pp 609, 610):

"Our conclusion is not in conflict with the principle that, where a taxpayer is engaged both in intrastate

and interstate commerce, a State may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the State, including both interstate and intrastate."

Other cases illustrative of the principles involved as applied to various types of formulae, under both the due process and commerce clauses, will be found in the footnote hereto.*

---

* (a) *Hump Hairpin Manfg. Co.* v. *Emmerson*, 258 US 290 (42 S Ct 305, 66 L ed 622). Here the State of Illinois, in taxing foreign corporations for the privilege of doing business, apportioned to Illinois that proportion of the company's outstanding capital stock as was represented by "business transacted and property located within the State." Held, approved "Clearly the statute is not a disguised attempt to tax interstate commerce. On the contrary, its purpose plainly is to differentiate State from interstate business and to impose the tax only on the former." (p 295)

(b) *National Leather Co.* v. *Massachusetts* (1928), 277 US 413 (48 S Ct 534, 72 L ed 935). In this case the franchise tax on foreign corporations looked to the taxpayer's outstanding capital stock as the tax base. A statutory ratio of real and personal property employed within the State, over their total asset counterparts everywhere, then apportioned the value subject to the State's franchise millage. Plaintiff company also owned all the stock of 2 subsidiary foreign corporations, both of which did business in Massachusetts. Held: No violation of the Fourteenth Amendment in including the value of the stock in these subsidiaries in the above ratio as a part of its assets employed by it in business within Massachusetts. The court said *inter alia* (p 423):

"It is settled law that a State may lawfully impose upon a foreign corporation a tax for the privilege of doing business within its borders which is measured by * * * the proportionate part of its total capital stock which is represented by the property located and business transacted within the State." (Citing *Hump Hairpin, supra,* among others.)

(c) *International Shoe Co.* v. *Shartel* (1929), 279 US 429 (49 S Ct 380, 73 L ed 781). Here the franchise tax on foreign corporations apportioned the value of outstanding capital stock and surplus employed in business within the State by a ratio determined by assets in Missouri over the company's total assets everywhere. In approving the tax, the court said (p 433):

"Appellant does a substantial amount of local commerce. A franchise tax imposed on a corporation, foreign or domestic, for the privilege of doing a local business, if apportioned to business done or property owned within the State, is not invalid under the commerce clause merely because a part of the property or capital included in computing the tax is used by it in interstate commerce."

In summary, the statute before us taxes the exercise and enjoyment of a privilege,† a privilege hav-

(d) *Western Cartridge Co.* v. *Emmerson* (1930), 281 US 511 (50 S Ct 383, 74 L ed 1004). Illinois here employed a ratio of property and business transacted within the State, over a taxpayer's total business and property, in order to apportion issued capital stock to Illinois for franchise tax purposes. The court held that a foreign corporation's rights under the commerce clause were not violated when the State included in the numerator of the above ratio such business that had an interstate character. The court said (p 514):

"As the amount depends on the relation each to the others of the various elements employed in the calculation, the fee or tax does not directly depend upon the amount of the taxpayer's interstate transactions. * * * The tax cannot be said directly or by necessary operation to affect any of the things done by petitioner which, by reason of transportation of goods to places outside Illinois in accordance with the directions of the purchasers, became elements or component parts of interstate or foreign commerce."

(e) *Commonwealth* v. *Ford Motor Co.* (1944), 350 Pa 236, 246, 247 (38 A2d 329), involved the Pennsylvania franchise tax. The extract quoted presents one of the issues before the court:

"There remain for our consideration appellant's several contentions that the tax imposed violates the Federal and State Constitutions. It is argued that the formula for measuring the base of the tax results in depriving appellant of its property without due process of law, in violation of the Fourteenth Amendment of the Federal Constitution, and is contrary to article 1, § 9, of the State Constitution. This conclusion is predicated upon the assumption that the tax is a tax upon property, and that it falls upon property beyond the jurisdiction of the Commonwealth to tax, in the form of tax-exempt securities of the United States and tangible and intangible property having its situs in other States. We held in *Commonwealth* v. *Columbia Gas & Electric Corp.*, 336 Pa 209 (8 A2d 404, 131 ALR 927), that this is a franchise tax and not a property tax. This discussion need not be repeated. Nor is it necessary to labor the point that a franchise tax may be *measured* by property which would not, itself, be amenable to a property tax. In *Flint* v. *Stone Tracy Company*, 220 US 107, 165 (31 S Ct 342, 55 L ed 389, Ann Cas 1912B, 1312), it was said: 'It is therefore well settled by the decisions of this court that when the sovereign authority has exercised the right to tax a legitimate subject of taxation as an exercise of a franchise or privilege, it is no objection that the *measure* of taxation is found in the income produced in part from property which of itself considered is nontaxable.' See, also, *National Leather Co.* v. *Massachusetts*, 277 US 413 (48 S Ct 534, 72 L ed 935). And, in *Educational Films Corporation of America* v. *Ward*, 282 US 379 (51 S Ct 170, 75 L ed 400, 71 ALR 1226), at page 389, Mr. Justice Stone, now [1944] Chief Justice, stated: 'It has held with like consistency that the privilege of exercising the corporate franchise is no less an appropriate object of taxation by one government merely because the corporate property or net income, which is made the *measure* of the tax, may chance to include the obligations of the other, or the income derived from them.'"

† Brandeis, J., in *Dawson* v. *Kentucky Distilleries & Warehouse Co.*, 255 US 288, 292 (41 S Ct 272, 65 L ed 638): "The name by which

·ing a real value, as the figures in the record before us amply demonstrate.  (Thus it is that cases relied upon by appellant wherein the concept of situs of property, whether tangible or intangible, controls taxability, are not precedent in the matter now before us. *Fargo* v. *Hart*, 193 US 490 [24 S Ct 498, 48 L ed 761]; *Udylite Corporation* v. *Corporation & Securities Commission*, 319 Mich 1.)   Where we have, as here, an integrated economic unit, operating as a functional entity, to say that the book value of its capital stock and surplus item, which is merely a bookkeeping figure, a comprehensive valuation, must be broken down into identifiable specific items, each within the taxing jurisdiction, to each of which an essential rationale of our old *Cleveland-Cliffs* decision ("such assets were not situated where the aid or protection of the laws or government of Michigan were available to plaintiff" [p 243]) must be applicable, is simply to deny the utility and validity of book value as a tax base for the assessment of a privilege tax.   The denial comes too late.   Authority is ample that we are not so constrained in our modes of taxation.   New and complex forms of business operations require the enactment of tax formulae fairly reflecting the relation of the State to the enterprise.   The tax concepts of the turn of the century served their purposes.   They did not mark the outermost limits of our constitutional powers.

It is not a *sine qua non* for the application of a privilege tax based upon book value that each of the asset properties be itself directly subject to the taxing authority of the jurisdiction.   This is perhaps most clearly seen in the decisions refusing to exclude even tax-exempt government securities in computing the capital stock and surplus of a corporation for

the tax is described in the statute is, of course, immaterial.   Its character must be determined by its incidents.".

franchise fee purposes. Thus it was held in *Werner Machine Co.* v. *Director of Taxation,* 350 US 492 (76 S Ct 534, 100 L ed 634):

"Appellant argues further that even if this is a franchise tax, it must fall because its effect is the same as if it had been imposed directly on the tax-exempt Federal securities. Since the tax remains the same whatever the character of the corporate assets may be, no claim can be sustained that this taxing statute discriminates against the Federal obligations. And since this is a tax on the corporate franchise, it is valid despite the inclusion of Federal bonds in the determination of net worth. This court has consistently upheld franchise taxes measured by a yardstick which includes tax-exempt income or property, even though a part of the economic impact of the tax may be said to bear indirectly upon such income or property. See, *e.g., Society for Savings* v. *Coite,* 6 Wall (73 US) 594 (18 L ed 897); *Provident Institution* v. *Massachusetts,* 6 Wall (73 US) 611 (18 L ed 907); *Hamilton Co.* v. *Massachusetts,* 6 Wall (73 US) 632 (18 L ed 904); *Home Insurance Co.* v. *New York,* 134 US 594 (10 S Ct 593, 33 L ed 1025); *Educational Films Corporation of America* v. *Ward,* 282 US 379 (51 S Ct 170, 75 L ed 400, 71 ALR 1226); *Pacific Co.* v. *Johnson,* 285 US 480 (52 S Ct 424, 76 L ed 893). We have only recently adhered to this principle in another aspect of this field of taxation. See *Society for Savings in the City of Cleveland* v. *Bowers,* 349 US 143, 147, 148 (75 S Ct 607, 99 L ed 950). *New Jersey Realty Title Ins. Co.* v. *Division of Tax Appeals,* 338 US 665 (70 S Ct 413, 94 L ed 439), on which appellant relies, is distinguishable, in that it did not involve a franchise tax, but rather a tax whose legal incidence this court found to be upon the intangible assets of the corporation."

Our conclusions are that a franchise fee may be imposed upon a foreign corporation for the privilege of conducting its activities in Michigan, that it may

(in the words of the Court in *Ford Motor Co. v. Beauchamp,* 308 US 331, 336) "be properly measured by capital wherever located," and that in determining the value of the intrastate privilege the weight "given the property beyond the State boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing State." We hold, upon the record before us, that the fee determined is neither "unfair" nor "palpably disproportionate," and that there is herein no violation of Michigan or United States constitutional provisions, in that there is no taking of property without due process, or denial of equal protection. There is, moreover, no violation of the commerce clause.

We agree with Mr. Justice Kelly that appellant's remaining claims of error "have been given proper consideration and have been found not to be sustained." We will, however, comment briefly upon the statutory construction question raised by appellant, involving the correlation of sections 4, 4b and 5 of the act,* as amended. Appellant urges, in brief, that section 4b, restricted to mining corporations, and not section 4, a section of more general scope, is applicable to it, that section 5 provides for no apportionment with respect to section 4b corporations, and hence that the tax must either be imposed on all its issued capital without apportionment, which it asserts would be unconstitutional, or, in the alternative, that it pay the minimum franchise tax of $10 only. The board, however, found that it was a section 4 corporation, to which section 5 (both parties agree) is applicable. Thus the board was not driven to choose between an asserted unconstitutional, or an

---

* CLS 1952, § 450.304 (Stat Ann 1953 Cum Supp § 21.205); CLS 1956, § 450.304b (Stat Ann 1955 Cum Supp § 21.207); CLS 1952, § 450.305 (Stat Ann 1953 Cum Supp § 21.208).—Reporter.

obviously absurd, construction of 4b. Nor need we make the choice between sections 4 and 4b (although the board's determination with respect thereto is clearly sustainable) in view of our holding, likewise the conclusion of the board, that apportionment under section 5 for the determination of the "annual franchise fee" pertains both to section 4 and section 4b. Thus all sections are given an harmonious construction and a reasonable application.

Order of appeal board affirmed. No costs, a public question.

BLACK, EDWARDS, and VOELKER, JJ., concurred with SMITH, J.

KAVANAGH, J., took no part in the decision of this case.