353 Mich. 636 (1958)
92 N.W.2d 22
DULUTH, SOUTH SHORE & ATLANTIC RAILROAD COMPANY
v.
CORPORATION & SECURITIES COMMISSION.
Docket No. 45, Calendar No. 47,303.
Supreme Court of Michigan.
Decided September 10, 1958.
Rehearing denied October 13, 1958.
Claim of appeal filed February 20, 1959.
Bodman, Longley, Bogle, Armstrong & Dahling (Henry I. Armstrong, Jr., and Thomas M. Beckley, of counsel), for plaintiff.
Paul L. Adams, Attorney General, Samuel J. Torina, Solicitor General, T. Carl Holbrook and *640 William D. Dexter, Assistants Attorney General, for defendants.
Claim of appeal filed in the Supreme Court of the United States February 20, 1959.
EDWARDS, J.
The Duluth, South Shore & Atlantic Railroad Company is a Minnesota corporation engaged primarily in hauling iron ore and freight to and from Minnesota and Wisconsin and Michigan's upper peninsula. Five hundred and fifty-eight miles of its tracks, 81% of the total, are within the borders of Michigan. Of all net ton miles of revenue freight hauled in 1951, 532,709,000 miles, or 78%, were hauled in Michigan. Most of this freight moved between States with only 61,031,000 miles of it, or 9% of the total, representing freight miles between loading and unloading points located in Michigan.
In 1952 the Michigan legislature sought to include railroads under then-existing legislation (CL 1948, § 450.301 et seq. [Stat Ann § 21.201 et seq.]) requiring the payment of a franchise and privilege fee by each domestic and foreign corporation. These amendments which are applicable to railroad corporations were PA 1952, Nos 183 and 270 (CLS 1952, §§ 450.304, 450.305b, 450.82 [Stat Ann 1953 Cum Supp §§ 21.205, 21.208(2)[*]]). These amendments were given immediate effect as of April 29 and June 12, 1952.
On August 28, 1952, appellant filed a report and paid under protest the sum of $5,908.45 which it claimed to be the amount due under PA 1952, No 183, if such was constitutional.
On April 13, 1953, the corporation and securities commission issued a determination rejecting the railroad's computation and computing the tax as follows:
*641
 "April 13, 1953
 "Duluth, South Shore & Atlantic Railroad Company
 1824 First Natl. Soo Line Bldg.
 Minneapolis 2, Minnesota
"Gentlemen:
"On September 2 we received your 1952 Michigan annual report with $5,908.45
"The privilege fee is computed on the paid-in capital and surplus as shown by the books of a corporation as of close of its fiscal or calendar year next preceding the time for filing. U.S. Government securities and paid-in capital surplus are not allowable deductions from surplus in computing the fee.
"We find the average ratio to be .798943. Applying this to paid-in capital of $10,500,000 and surplus of $1,693,500 at rate of 4 mills on the dollar results in $38,969.64 including $2 filing fee. Kindly remit balance due of $33,061.19.
 "Very truly yours,
 /s/ ANN SAWASKY,
 "Director, Annual Reports"
The railroad then appealed this determination to the Michigan corporation tax appeal board which, after hearing, approved the fee as computed by the commission; and from this decision the railroad brings this appeal to this Court.
Before we detail and deal with the issues presented on appeal, some additional facts must be stated:
The appellant railroad was incorporated under the laws of Minnesota on October 19, 1949, and on November 1, 1949, it acquired the assets of Duluth, South Shore & Atlantic Railway Company and of Mineral Range Railroad Company. This acquisition was pursuant to a reorganization of these 2 railroads under section 77 of the United States bankruptcy act, as amended,[**] by virtue of which appellant purchased these assets. It paid for them by the *642 issue of 210,000 shares of stock of no par value but with a stated value of $50 a share, and $5,000,000 in face value of 4% bonds. It has issued no additional stock so that at the time of filing its annual report for 1952 its outstanding paid-in capital consisted of these 210,000 shares. All of this stock was issued to and is owned by the Canadian Pacific Railway Company. None of it has ever been sold. This reorganization, appellant's issue of stock and its purchase of the assets of the old railroads, was subject to the approval and authorization of the interstate commerce commission and the district court of the United States for the district of Minnesota, fourth division.
Judge Gunnar Nordbye's opinion approving the reorganization plan recited certain other relevant facts:
"The debtor operates lines of railroad extending from Sault Ste. Marie, Michigan, and from St. Ignace, Michigan, westward to Soo Junction, Michigan, where they join, thence westward through Marquette, Michigan, to Nestoria, Michigan, thence northward from Nestoria to Houghton, Michigan, and westward from Nestoria to Marengo, Wisconsin, thence westward through Ashland, Wisconsin, and Superior, Wisconsin, to Duluth, Minnesota, comprising 425 miles of main line, 21 miles of branch line, and 102 miles of leased line, a total of approximately 548 miles. The cost of reproduction of the principal debtor's property less depreciation plus value of land and rights amounted to $15,717,941, as of December 31, 1944, according to the report of the interstate commerce commission's bureau of valuations.
"The portion of the lines extending from Marquette through Nestoria to Houghton was formerly owned and operated by the Marquette, Houghton & Ontonagon Railroad Company, and is known as MH&O mortgage district. The remaining portions *643 of the debtor's railroad, extending westward from Nestoria and eastward from Marquette, are collectively known as the DSS&A mortgage district.
"The debtor also operates in connection with the above railroads, the railroad of the Mineral Range, 26 miles long, extending from Houghton, Michigan, through Hancock to Calumet, Michigan. The cost of reproduction of the Mineral Range Railroad, less depreciation plus value of land and rights, was $797,917 as of December 31, 1944, according to the report of the commission's bureau of valuations. This railroad has value principally as a feeder to the debtor's lines.
"On January 2, 1937, the debtor began this proceeding by filing in this court a petition showing that it was unable to meet its debts as they matured and that it desired to effect a plan of reorganization pursuant to section 77 of the bankruptcy act. The debtor's obligations at that time included, in addition to large amounts of unsecured debt, the following amounts of debt secured by outstanding mortgages of its properties:

 "Bonds secured by the MH&O 6% mortgage of 1885 (hereinafter
 called Sixes) assumed by the principal debtor ............. $ 1,400,000
 "Bonds secured by the DSS&A 5% first mortgage of 1887
 (hereinafter called Fives) ................................. 4,000,000
 "Bonds secured by the DSS&A consolidated mortgage of 1890
 (hereinafter called Fours) ................................ 15,107,000
 "Unpaid interest on Fours ................................... 21,599,315
 ___________
 "Total ................................................ $42,106,315

"On January 30, 1937, the court appointed 2 trustees in bankruptcy: Mr. James L. Homire who was nominated by counsel for the Prudential Insurance Company which owned $416,000 of the Fives, and Mr. E.A. Whitman who was nominated by counsel for the Canadian Pacific Railway Company. Mr. *644 Homire has since resigned, and Mr. Whitman is deceased. Mr. P.L. Solether is now the sole trustee.
"On July 1, 1937, the Mineral Range filed in this court a petition showing that it was unable to meet its debts as they matured, and praying that it be allowed to effect a plan of reorganization in connection with the plan to be effected for the debtor. The outstanding obligations of the Mineral Range at that time included, in addition to large amounts of unsecured debt and equipment trust obligations, $1,598,675 of principal and $231,912 of unpaid interest owing on bonds secured by mortgages of its properties.
"Persons other than the Canadian Pacific held $3,199,000 of the debtor's Fives; an individual bondholder held $4,000 (reduced to $2,800 by subsequent payment) of Mineral Range bonds; and the Canadian Pacific owned directly or indirectly all of the other outstanding bonds of both the debtor and the Mineral Range."
As indicated above, the great majority of bonded indebtedness was due the Canadian Pacific Railway, with $3.203,000 held by other persons or insurance companies.
After lengthy discussion of various proposed plans for reorganization, the Federal court approved a new capitalization plan proposed by the interstate commerce commission, as follows:
"Turning now to the plan approved by the commission, it contemplates that all properties of the principal and subsidiary debtors be vested in the reorganized company, which will then issue $5,000,000 of new 4% contingent interest bonds secured by a first mortgage on all properties of the reorganized company, and $10,500,000 of new capital stock consisting of 210,000 shares of common stock without par value but having a stated value of $50 per share. $500,000 of this stock is to be issued on the basis of the reorganized *645 company's acquisition of the properties of the Mineral Range.
"In support of such capitalization, the commission's report referred inter alia, to the evidence establishing the following facts. The debtor's average net income available for fixed charges as adjusted, for the years 1928 to 1945 (excluding the so-called depression years of 1930 to 1933, inclusive, and the so-called boom years of 1942 to 1945, inclusive) was $312,468. On the basis of studies made by the officers and staff of the trustees and debtors, it was estimated that net earnings of the future normal year would amount to $312,468. Deducting from the anticipated normal year's net earnings of $312,468, $200,000 of interest on new bonds, Federal income taxes at 38% on the remainder, and $25,000 as a sinking fund payment on the new bonds, there would be about $44,730 available for dividends on the new stock in the future normal year, or about 21 cents per share. On the basis of net earnings equal to those of 1936 or 1941, the income available for dividends on the new stock would amount to over $1 per share. Capitalized at 4%, $312,468 produces $7,811,700 and the 1936 and 1941 earnings produce $15,569,850 and $16,055,400 respectively. The commission's bureau of valuation estimates of cost of reproduction less depreciation plus the value of land and rights for the 2 debtors produce a total of $16,515,858.
"The court concludes that it should approve the new capitalization as approved by the commission.
"The commission's plan proposed (in addition to cash distributions hereafter mentioned) the following divisions of the proposed issues of new bonds and stock as between (a) the $3,199,000 of Fives which were held on the effective date of the plan, January 1, 1945, by persons other than the Canadian Pacific, and (b) the holder of $4,000 of the subsidiary debtor's bonds, and (c) the Canadian Pacific as the then owner of $801,000 of Fives and of all other securities of the debtor and of all other securities of the Mineral Range.

*646
 Bonds Stocks
 "To holders of $3,199,000
 of Fives ................. $1,919,400 ............
 "To holders of $4,000 of
 Mineral Range Bonds ...... 2,000 ............
 "To the Canadian Pacific ... 3,078,600 $10,500,000
 __________ ___________
 Total ................ $5,000,000 $10,500,000"

The effect of this reorganization is shown in exhibit 12, the comparative balance sheets of the predecessor railroads and the successor railroad for the year ended December 31, 1949. This exhibit showed on the asset side a reduction of the figures stated for total investments, less recorded depreciation and amortization, from $46,738,970 to $16,037,656. On the liability side, it showed a reduction of capital stock from $22,000,000 to $10,500,000, a reduction of long-term debt from $26,176,972 to $6,761,272, and the wiping off the books of $32,854,673 of interest in default.
The results of the operation of the new company down to December 31, 1951, the last balance sheet prior to the tax year in dispute, are shown on the railroad's balance sheet of that date. Here the comparable total investment figure, less recorded depreciation and amortization, is shown as increased to $17,198,166. The capital stock is shown at the same figure, $10,500,000, and the total surplus shows an increase of approximately $1,000,000 to $1,693,501.
The corporation and securities commission took these last figures as "the paid-up capital and surplus" for the purpose of its computation of the tax due under section 5b (CLS 1952, § 450.305b [Stat Ann 1953 Cum Supp § 21.208(2)]).
The appellant railroad offers 3 arguments in this appeal:
*647 (1) That the commission and tax appeal board erred in the determination of paid-up capital and surplus as stated above;
(2) That net ton miles of interstate freight transported by it in Michigan cannot be used to measure that portion of paid-up capital and surplus which is taxable in Michigan, without violation of the commerce clause of the United States Constitution;
(3) That on 4 separate grounds PA 1952, No 183, is unconstitutional in the proposed application to appellant railroad, under the Michigan Constitution (1908).
We shall examine these contentions in this order.
As to the first issue raised, the appellant railroad contends that the corporation and securities commission erred in accepting appellant's own book figures as to capital and surplus. It contends that its book figures are controlled by interstate commerce commission accounting methods and by title 49, § 20 a, of the United States code, and relies upon In re Appeal of Hoskins Manfg. Co., 270 Mich 592, wherein this Court stated our general rule (pp 596, 597):
"As a general proposition, we think the State is justified in holding that the tax is determined from the corporate books. The statute does not provide, in express language or by authorization of expense, for the impractical procedure of audit and appraisal of each corporation each year by the State. It contemplates that the tax shall be found from the annual report of the corporation to the secretary of State, supplemented by the further facts demanded under PA 1931, No 327, § 82(o), and the detailed and exact information provided for in CL 1929, § 10143.[***] Obviously, the source of information and facts is the corporate books, which the statute assumes, and requires, shall be kept correctly. Obviously, also, the books represent the action of the corporation in valuing *648 its assets and it has little cause to complain of such book values.
"But, because humans may err, there are exceptions to such rule. The State itself holds the balance sheet final only in the absence of fraud or error. Such exception is reasonable and proper if `error' is given the broad meaning of `incorrectness' and works to the protection of the taxpayer as well as the State. The law should be read and administered to secure to the State all sums justly due it, but no more."
It should be noted in passing that the Hoskins rule was applicable only to computation of "surplus" and did not involve any dispute concerning "paid-in capital."
The statutory provisions under which paid-in capital and surplus are computed are as follows:
"For the purpose of this act only, each share of no par value shall be deemed to have the value of at least $1, or such value as shall have been fixed by the corporation for the sale of such stock, or the book value as determined by the Michigan corporation and securities commission, whichever may be the higher. In any case where the capital of a corporation is not divided into shares, the whole property thereof shall be deemed to be the authorized capital stock for the purposes of this act.
"The term `surplus,' as used in this act, shall be taken and deemed to mean the net value of the corporation's property, less its outstanding indebtedness and paid-up capital; but in no case, either as to domestic or as to foreign corporations, shall any deduction be made from the item of paid-up capital, in computing the franchise fee thereon, by reason of any impairment of the same." CLS 1952, § 450.304 (Stat Ann 1953 Cum Supp § 21.205).
The statutory language above, plus the interpretation placed thereon in In re Appeal of Newton Packing Co., 279 Mich 139, lends weight to appellees' *649 contention that appellant's fair value argument is applicable only to the surplus item. Nonetheless we will discuss the issue as appellant poses it.
Appellant's brief cites the evidence upon which it argues that the commission's finding of paid-up capital and surplus overstated the actual value of its assets:
"As will be remembered, in the course of the reorganization certain creditors of the old railroads desired to receive bonds of the corporation resulting from the reorganization (this petitioner) rather than the shares of its stock to which they would be entitled under the plan. It was agreed between them and the Canadian Pacific Railway Company that the stock to which they would be entitled would be exchanged for some of the bonds to which that railroad company would be entitled. It was, therefore, necessary to fix a true value for the stock and a true value for the bonds. After arm's length negotiations, it was determined that the value of the stock was $7.50 per share and the value of the bonds $70 per $100 of face value. These values were approved both by the I.C.C. and the court.
"Again, at the hearing petitioner gave evidence that the stocks of railroads comparable to petitioner had a market value about equal to 7.78 times their annual earnings per share. It also showed that the annual earnings of petitioner in 1951 were about $1 per share. On this basis, the value of each share of the no par stock of petitioner was $7.78 per share which is very close to the value assigned to this stock by the I.C.C. at the time of reorganization.
"This means that the actual value of the assets received by petitioner at the time of its incorporation was actually no more than $5,133,800 even allowing a value of $7.78 per share to the stock.
"210,000 shares at $7.78 per share ...... $1,633,800 "$5,000,000 of bonds at 70% of face value 3,500,000 ___________ $5,133,800"
*650 The first computation appellant relies on was made prior to the entry of the reorganization order. The opinion upon which that order was based, as we have noted, stated the fair value of the physical assets of the appellant as $16,515,858, and authorized capitalization at $10,500,000.
The record discloses no protests at the hearing in regard to these determinations when they were made by the interstate commerce commission and approved by the Federal district court.
The only other statistic pertaining to appellant's fair value argument is that based on Moody's estimate of a market value for railroad stocks of 7.78 times earnings. Appellant urges that this formula should be accepted to show the total value of the capital stock and that it should be applied to 1951 earnings only.
We note that every share of appellant's stock is owned by the Canadian Pacific Railway Company. We note that none has been sold or offered for sale. We note that the $1 per share earnings, now the subject of appellant's complaints, are substantially the same as earnings anticipated by the Federal district court when it approved the reorganization plan with its proposed capitalization:
"In support of such capitalization, the commission's report referred inter alia, to the evidence establishing the following facts. The debtor's average net income available for fixed charges as adjusted, for the years 1928 to 1945 (excluding the so-called depression years of 1930 to 1933, inclusive, and the so-called boom years of 1942 to 1945, inclusive) was $312,468. On the basis of studies made by the officers and staff of the trustees and debtors, it was estimated that net earnings of the future normal year would amount to $312,468. Deducting from the anticipated normal year's net earnings of $312,468, $200,000 of interest on new bonds, Federal income *651 taxes at 38% on the remainder, and $25,000 as a sinking fund payment on the new bonds, there would be about $44,730 available for dividends on the new stock in the future normal year, or about 21 cents per share. On the basis of net earnings equal to those of 1936 or 1941, the income available for dividends on the new stock would amount to over $1 per share. Capitalized at 4%, $312,468 produces $7,811,700 and the 1936 and 1941 earnings produce $15,569,850 and $16,055,400 respectively. The commission's bureau of valuation estimate of cost of reproduction less depreciation plus the value of land and rights for the 2 debtors produce a total of $16,515,858."
The tax appeal board summarized its holdings as to the disputed computation of appellant's paid-up capital thus:
"In determining the amount of capital of appellant created by the contributions of the shareholders, the appellee commission in this case used the book value of $10,500,000 as returned by the corporation on its 1952 annual report. There is evidence in the record in the proceedings before the interstate commerce commission and the Federal district court from which the commission could have found that the contributions of the shareholders to capital equaled or exceeded this stated figure. The testimony of the witness Weston supports the appellee in this regard. Upon this record there is no evidence from which this appeal board can find that such determination by the appellee commission was erroneous or amounted to an abusive exercise of its discretion. Therefore the appeal board concludes that on this issue the determination of capital made by the corporation and securities commission was proper and it is approved."
As to the dispute about the surplus figure employed by the commission in computing the disputed tax, appellee again points to the fact that it accepted appellant's own figures. Appellant's basic argument *652 on this point follows that just outlined above  namely, that at the time of the reorganization plan the total equity in the new railroad should be measured by 7.78 times $210,000 (at $1 a share earnings), plus 70% of the value of $5,000,000 worth of bonds, or a total of $5,133,800. As a consequence, appellant contends that the surplus of $629,110 reported in its 1949 balance sheet was unrealistic and nonexistent and should be deducted from the surplus of $1,693,501 reported in its 1951 balance sheet.
In the end, appellant's argument pertaining to the computation of its paid-up capital and surplus amounts to the assertion that its own balance sheet figures overstated the value of its physical assets, including land and buildings and trackage and equipment, by $9,500,000.
Yet, in a supplemental statement dated December 31, 1953, exhibit 11 in this proceeding, appellant shows its "transportation property" valued at $18,970,629.
This is an appeal in the nature of certiorari from a decision of the Michigan tax appeal board. In such a case we do not disturb the findings of fact of the board when they are supported by competent evidence. Udylite Corporation v. Corporation & Securities Commission, 319 Mich 1; Chicago, Duluth & Georgian Bay Transit Co. v. Corporation & Securities Commission, 319 Mich 14.
See, also, Royal v. Ecorse Police & Fire Commission, 345 Mich 214.
We do not find the "error" or "incorrectness" refferred to in the Hoskins Case, supra. There was competent evidence to support the determination of appellant's paid-up capital and surplus made by appellee commission.
We now turn to what is, in our view, the most significant constitutional issue presented by this case. It is appellant's claim that the formula applied by *653 the commission to appellant's paid-up capital and surplus to determine the portion thereof which is allocable to Michigan is offensive to the commerce clause of the United States Constitution.
The formula objected to as set forth in the 1952 amendment as section 5b (CLS 1952, § 450.305b [Stat Ann 1953 Cum Supp § 21.208(2)]) is as follows:
"For the purpose of determining the annual franchise fee, the tax payable by a railroad company shall be measured by that portion of its paid-up capital and surplus determined by the average of the following 2 percentage ratios: The net ton miles of freight handled in this State to the total net ton miles of freight handled within and without the State; the number of miles of all track over which it operates within this State to the total number of miles of all track over which it operates within and without the State."
It is appellant's contention that the appellee commission could not constitutionally employ, in determining "net ton miles of freight handled in this State," any net ton miles of freight which had moved in Michigan in interstate commerce. The practical importance of this argument is shown in the following calculations of the percentage of appellant's paid-up capital and surplus to be allocated to Michigan for the purpose of computation of the franchise tax. The first calculation is that of appellee commission, and the second as proposed by appellant railroad:

*654
 "Net ton miles of freight
 (interstate and intrastate)
 532,709,000 (in
 Michigan)
 ___________________________ = 78.61%
 677,639,000(total)
 "Trackage:
 558.37 (in Michigan)
 ___________________________ = 81.18%
 687.85 (total)
 _________
 159.79%
 _________
 ÷ 2 = 79.895%"
 "Net ton miles of freight:
 61,031,000 (Michigan intrastate)
 __________________________________ = 9.00%
 677,639,000 (total)
 "Trackage:
 558.37 (in Michigan)
 ________________________ = 81.18%
 687.85 (total) _________
 90.18%
 _________
 ÷ 2 = 45.09%"

The provision of the United States Constitution relied upon by appellant is as follows:
"The Congress shall have power * * *
"3. To regulate commerce with foreign nations, and among the several States, and with the Indian tribes." US Const, art 1, § 8.
Few provisions in our Constitution have provided as much ground for debate as to interpretation, or provoked as much litigation. And the supreme court has divided closely and repeatedly from early, down to recent, history upon the general question presented by this case, pertaining to the extent of restraint imposed by these words upon a State's power *655 to tax a business which is engaged in interstate commerce.
It should perhaps be noted at the outset that the words of the commerce clause do not in themselves specifically interdict State taxation of interstate commerce.[****] The United States supreme court's interpretation of the clause has, however, held constitutionally offensive certain general classifications of State taxes. Among these classifications, the following may be cited as impinging to some degree upon our present problem:
(1) Privilege taxes requiring payment of a tax as a simple condition precedent for carrying on exclusively interstate commerce. Ozark Pipe Line Corporation v. Monier, 266 US 555 (45 S Ct 184, 69 L ed 439); Puget Sound Stevedoring Co. v. State Tax Commission, 302 US 90 (58 S Ct 72, 82 L ed 68); Spector Motor Fuel Service, Inc., v. O'Connor, 340 US 602 (71 S Ct 508, 95 L ed 573); Railway Express Agency, Inc., v. Virginia, 347 US 359 (74 S Ct 558, 98 L ed 337, 757).
(2) Direct taxes upon either interstate commerce or gross receipts from interstate sales  at least where such taxes were not reasonably apportioned. Ratterman v. Western Union Telegraph Co., 127 US 411 (8 S Ct 1127, 32 L ed 229); Meyer v. Wells, Fargo & Co., 223 US 298 (32 S Ct 218, 56 L ed 445); East Ohio Gas Co. v. Tax Commission of Ohio 283 US 465 (51 S Ct 499, 75 L ed 1171); Cooney v. Mountain States Telephone & Telegraph Co., 294 US 384 (55 S Ct 477, 79 L ed 934); J.D. Adams Manfg. Co. v. Storen, 304 US 307 (58 S Ct 913, 82 L ed 1365, 117 ALR 429); Freeman v. Hewit, 329 US 249 (67 S Ct 274, 91 L ed 265).
*656 See, also, United States Glue Co. v. Town of Oak Creek, 247 US 321 (38 S Ct 499, 62 L ed 1135, Ann Cas 1918E, 748).
(3) Taxes which it held unreasonably burdensome upon interstate commerce. Western Union Telegraph Co. v. Kansas, 216 US 1 (30 S Ct 190, 54 L ed 355); Ingels v. Morf, 300 US 290 (57 S Ct 439, 81 L ed 653).
(4) Taxes which it held discriminatory in effect as between interstate and intrastate commerce. Webber v. Virginia, 103 US 344 (26 L ed 565); Walling v. Michigan, 116 US 446 (6 S Ct 454, 29 L ed 691); Memphis Steam Laundry v. Stone, 342 US 389 (72 S Ct 424, 96 L ed 436).
On the other hand, the same court has upheld as not offending the commerce clause State taxes in at least the following classifications:
(1) Property taxes levied on property located within the taxing State and used for interstate commerce. Western Union Telegraph Co. v. Attorney General of Massachusetts, 125 US 530 (8 S Ct 961, 31 L ed 790); Adams Express Co. v. Ohio State Auditor, 166 US 185 (17 S Ct 604, 41 L ed 965); Baker v. Druesedow, 263 US 137 (44 S Ct 40, 68 L ed 212); Ott v. Mississippi Valley Barge Line Co., 336 US 169 (69 S Ct 432, 93 L ed 585).
(2) Taxes levied upon net income of business engaged in interstate commerce where the portion of net income taxed was reasonably apportioned as to the taxing State. United States Glue Co. v. Town of Oak Creek, supra; Underwood Typewriter Co. v. Chamberlain, 254 US 113 (41 S Ct 45, 65 L ed 165); Bass, Ratcliff & Gretton, Limited, v. State Tax Commission, 266 US 271 (45 S Ct 82, 69 L ed 282).
(3) Taxes levied directly upon interstate commerce (or gross receipts therefrom) but held reasonably related to occasioning interstate commerce to pay its own way in the taxing State. Postal Telegraph *657 Cable Co. v. City of Richmond, 249 US 252 (39 S Ct 265, 63 L ed 590); Interstate Busses Corporation v. Blodgett, 276 US 245 (48 S Ct 230, 72 L ed 551); Western Live Stock v. Bureau of Revenue, 303 US 250, see cases cited, p 254 (58 S Ct 546, 82 L ed 823, 115 ALR 944).
See, also, Wisconsin v. J.C. Penney Co., 311 US 435 (61 S Ct 246, 85 L ed 267, 130 ALR 1229).
(4) Privilege or franchise taxes levied upon the right to do intrastate business, including where the business concerned was engaged in both inter- and intrastate commerce, provided only that the tax or fee was reasonably related to the value of the intrastate business done by the taxpayer in the taxing State. St. Louis-San Francisco R. Co. v. Middlekamp, 256 US 226 (41 S Ct 489, 65 L ed 905); Hump Hairpin Manfg. Co. v. Emmerson, 258 US 290 (42 S Ct 305, 66 L ed 622); International Shoe Co. v. Shartel, 279 US 429 (49 S Ct 380, 73 L ed 781); Ford Motor Co. v. Beauchamp, 308 US 331 (60 S Ct 273, 84 L ed 304); International Harvester Co. v. Evatt, 329 US 416 (67 S Ct 444, 91 L ed 390); Interstate Oil Pipe Line Co. v. Stone, 337 US 662 (69 S Ct 1264, 93 L ed 1613).
Against this background of instances where the commerce-clause objection to a State tax has been sustained or denied, we consider our instant tax.
The specific facts frequently determine whether or not a State tax as applied to a specific taxpayer is held repugnant to the commerce clause. Five relevant facts distinguish our instant case from the cases relied upon by the appellant:
(1) The appellant is a railroad corporation which has most of its trackage and other physical facilities located in Michigan and hence makes year-round use of the services and protection of this State;
*658 (2) The appellant's business is principally interstate commerce, but it also engages in substantial intrastate commerce in Michigan;
(3) As to the commerce-clause argument advanced by appellant, no claim is advanced that the $38,969 tax is unreasonable and this record amply supports a contrary finding of fact of the Michigan corporation tax appeal board;
(4) The tax is levied upon all business organized for profit and doing business within the State of Michigan and is plainly nondiscriminatory as to this taxpayer;[*****]
(5) The tax is not levied upon any part of the interstate commerce of the appellant or any direct product thereof, but upon appellant's privilege of doing business within Michigan.
This last point bears elucidation since it is crucial to our decision herein.
The tax complained of has been interpreted by this Court as a franchise tax imposed upon the right to do intrastate business  with that privilege measured by the amount of paid-up capital and surplus reasonably allocable to Michigan.
"We are impressed that in the discussion of this matter counsel lose sight of the nature of the privilege fee sought to be collected. It is not a tax upon the proceeds of the business of the corporation. It in no way involves the tolls collected from those using the bridge as a means of transportation between Detroit and Canada. It is a fee imposed by law `for the privilege of exercising its franchise and of transacting its business within this State.' The distinction between such a fee and a tax upon property was clearly pointed out in Union Steam Pump Sales Co. v. Secretary of State, 216 Mich 261, and later in In re Truscon Steel Co., 246 Mich 174, and in In re G.H. Hammond Co., 246 Mich 179. The question *659 presented is so clearly disposed of in In re Detroit & Windsor Ferry Co., 232 Mich 574, that further discussion seems unnecessary." In re Detroit International Bridge Co., 257 Mich 52, 59.
See, also, Holland Hitch Co. v. State of Michigan, 318 Mich 474.
Mr. Justice SMITH, in a recent decision of this Court interpreting the same tax (albeit a different allocation formula), held:
"We are taxing the privilege of carrying on intrastate activities. * * * We are taxing the value of the exercise of a privilege in this State and we ascertain that value through the application of property, payroll, and sales factors to the fair average stock value or the paid-up capital and surplus." Cleveland-Cliffs Iron Co. v. Corporation & Securities Commission, 351 Mich 652, 682.
Over and above the legislative statement of the purpose of the tax set forth in CLS 1952, § 450.304 (Stat Ann 1953 Cum Supp § 21.205), and the interpretation thereof by this Court just cited, the intrastate character of the tax is best portrayed by section 5e of the statute:
"If it shall appear on the application of the taxpayer or otherwise that an allocation factor determined pursuant to this act does not properly reflect the activity, business, receipts and capital of a taxpayer reasonably attributable to the State, the commission shall adjust it by:
"(1) Excluding 1 or more of the factors or any component thereof;
"(2) Including 1 or more other factors, such as expenses, purchases, contract values (minus subcontract values);
"(3) Excluding proportionately 1 or more asset items in computing entire paid-up capital and surplus; or
"(4) Apply any other similar method calculated to effect a fair and proper allocation according to the *660 receipts, activity, business and capital reasonably attributable to this State." (Emphasis supplied.) CLS 1956, § 450.305e (Stat Ann 1957 Cum Supp § 21.208[5]).
Under all of these facts, Michigan's right to levy the tax here contested would be supported by many of the previous holdings of the United States supreme court to which we have already referred.
The cardinal question, however, which appellant submits pertains to the allocation formula and the use therein of a factor of interstate commerce. As stated by appellant, the crucial question is:
"Can the net ton miles of freight transported in interstate and foreign commerce by petitioner and appellant (a railroad) in the State of Michigan be considered and used together with other factors for the purpose of measuring the portion of such railroad's capital and surplus that is taxable by the State of Michigan for purposes of the annual franchise tax?"
The question is not a new one and it has been answered many times before.
In Maine v. Grand Trunk R. Co., 142 US 217 (12 S Ct 121, 35 L ed 994), a State excise tax for the privilege of doing business in Maine was levied upon all gross receipts of the railroad, apportioned according to the number of miles operated in Maine. The tax was held not offensive to the commerce clause although, obviously, there was an interstate commerce factor in the tax formula. The case has been cited and approved many times since. See Interstate Oil Pipe Line Co. v. Stone, supra, 666; Central Greyhound Lines, Inc., v. Mealey, 334 US 653, 658, 663 (68 S Ct 1260, 92 US 1633).
In the Interstate Oil Pipe Line Case, Mr. Justice Rutledge, speaking for the majority of the court, said (pp 666, 667):
*661 "The statute is not invalidated by the commerce clause of the Federal Constitution merely because, unlike the statute attacked in Memphis Natural Gas Co. v. Stone, 335 US 80 (68 S Ct 1475, 92 L ed 1832), it imposes a `direct' tax on the `privilege' of engaging in interstate commerce. Any notions to the contrary should not have survived Maine v. Grand Trunk R. Co., 142 US 217, which flatly rules the case at bar. That case sustained a State statute which imposed upon an interstate railroad corporation `an annual excise tax [measured by apportioned gross receipts], for the privilege of exercising its franchises in this State.' The Grand Trunk decision has been approved by this court as recently as the other controlling case of Central Greyhound Lines v. Mealey, 334 US 653, at 658, 663, in which the court permitted New York to impose a tax on the gross receipts from the operation of an interstate bus line, provided that tax was apportioned according to mileage traveled within the State. The Mealey Case is not distinguished by saying that it involved only a tax on gross receipts and not a tax on interstate commerce itself, for gross receipts taxes have long been regarded as `direct' in cases which are supposed to support the proposition that `direct' taxes on interstate commerce are invalid under the commerce clause."
In International Harvester Co. v. Evatt, supra, the United States supreme court considered an Ohio privilege tax described as follows (p 419):
"The tax is computed under the Ohio statute in the following manner: Section 5498[******] prescribes the formula used in determining what part of a taxpayer's total capital stock represents business and property conducted and located in Ohio. To determine this, the total value of issued capital stock is divided in half. One half is then multiplied by a fraction, the numerator of which is the value of all the taxpayer's Ohio property, and the denominator of which is the *662 total value of all its property wherever owned. The other half is multiplied by another fraction whose numerator is the total value of the `business done' in the State and whose denominator is country-wide business. Addition of these 2 products gives the tax base, which, when multiplied by the tax rate of 1/10 of 1%, produces the amount of the franchise tax.
"In the `business done' numerator, the State included as a part of Ohio business an amount equal to the sales proceeds of a large part of the goods manufactured at appellant's Ohio plants, no matter where the goods had been sold or delivered."
And Mr. Justice Black, for a unanimous court, said as follows (p 421):
"Of course, the commerce clause does not bar a State from imposing a tax based on the value of the privilege to do an intrastate business merely because it also does an interstate business. Ford Motor Co. v. Beauchamp, 308 US 331, 336 (60 S Ct 273, 84 L ed 304). Nor does the fact that a computation such as that under Ohio's law includes receipts from interstate sales affect the validity of a fair apportionment. See, e.g., Hump Hairpin Manfg. Co. v. Emmerson, 258 US 290 (42 S Ct 305, 66 L ed 622); Underwood Typewriter Co. v. Chamberlain, 254 US 113 (41 S Ct 45, 65 L ed 165); American Manfg. Co. v. St. Louis, 250 US 459 (39 S Ct 522, 63 L ed 1084); International Shoe Co. v. Shartel, 279 US 429, 433 (49 S Ct 380, 73 L ed 781); Western Cartridge Co. v. Emmerson, 281 US 511 (50 S Ct 383, 74 L ed 1004). And here, it clearly appears from the background of Ohio's tax legislation that the whole purpose of the State formula was to arrive, without undue complication, at a fair conclusion as to what was the value of the intrastate business for which its franchise was granted." (Emphasis supplied.)
See, also, the discussion of the commerce-clause problem in Mr. Justice SMITH'S opinion in Cleveland-Cliffs, supra, 690 ff, particularly the footnote, p 695.
*663 In a recent well-considered decision upholding a Massachusetts excise tax wherein the allocation formula likewise contained interstate factors, the Massachusetts supreme court said:
"These decisions of the supreme court of the United States, as we understand them, sustain the constitutionality under the commerce clause of a State excise (like that in the present case) on a domestic corporation for possessing or exercising its corporate privileges, if measured by net income, apportioned, as in the present case, in a practical way (which need not by any means be precise) to give a reasonable and rough approximation of values attributable to the taxing State granting the privileges. The fact that net income from interstate transactions (and the value given to intrastate privileges by them) may be taken into account reasonably in the tax computations is immaterial." State Tax Commission v. John H. Breck, Inc., 336 Mass 277 (144 NE 2d 87, 101).
We recognize, of course, that the precise formula with which we deal in the instant case is somewhat different from the formulae in cases just cited. But we are unable to find any distinction in the constitutional principles applicable.
We construe the formula in section 5b as having as its purpose the ascertaining of a fair proportion of appellant's paid-up capital and surplus allocable to Michigan for purpose of taxing appellant's right to carry on its intrastate business.
Appellant relies heavily upon the Michigan cases of Gartland Steamship Co. v. Corporation & Securities Commission, 339 Mich 661; and Panhandle Eastern Pipe Line Co. v. Corporation & Securities Commission, 346 Mich 50.[*******]
*664 Both of these cases may be distinguished from our instant case on their facts. Gartland had no property in Michigan and did what the Court apparently regarded as only an inconsequential intrastate business in Michigan. Over 90% of Panhandle's pipe line, properties and activities were located outside of Michigan. In addition, Panhandle involved the continuous flow of gas from the wellheads in the Southwest to Michigan customers. See Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 US 157 (74 S Ct 396, 98 L ed 583). Neither case involved the identical formula objected to here. And in both cases, this Court, while rejecting the specific formula, upheld the right to levy the tax and ordered recomputation under section 5e to achieve a reasonable result.
It is obvious that what the State offered in service and protection to the Gartland and Panhandle taxpayers in return for the tax was substantially different (particularly in the Gartland Case) from the fact situation considered herein. This distinction has been cited as a decisive one:
"The Constitution is not a formulary. It does not demand of States strict observance of rigid categories nor precision of technical phrasing in their exercise of the most basic power of government, that of taxation. For constitutional purposes the decisive issue turns on the operating incidence of a challenged tax. A State is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the State has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." Wisconsin v. J.C. Penney Co., 311 US 435, 444 (61 S Ct 246, 85 L ed 267, 130 ALR 1229).
*665 Both Gartland and Panhandle opinions, however, relied upon Cooney v. Mountain States T. & T. Co., 294 US 384 (55 S Ct 477, 79 L ed 934), for constitutional authority. Both failed to distinguish between the direct taxation of interstate commerce (which Cooney ruled out) and the employment of an interstate-commerce factor in the formula for determining the amount of paid-up capital and surplus to be allocated to Michigan in computing the fee to be assessed for doing intrastate business in Michigan.
We find no United States supreme court precedent which interprets the commerce clause as forbidding use of such an allocation formula unless the result is shown to be unreasonable or discriminatory.
We now limit the application of the opinions in Gartland and Panhandle and hold that there is no constitutional barrier[********] to the use of an interstate-commerce factor in the allocation formula for determining the portion of paid-up capital and surplus allocable to Michigan for computation of a franchise tax for the right to carry on intrastate business in Michigan where, as here, there is no showing that such formula reaches an unreasonable or discriminatory result.
As to the third group of issues wherein appellant argues that this tax violates 4 separate provisions of the State Constitution, we can be more concise.
The essence of appellant's contention is that the instant franchise tax is in fact a tax upon the same subject of taxation as is taxed by a much older statute, *666 PA 1905, No 282 (CL 1948 and CLS 1954, § 207.1 et seq. [Stat Ann 1950 Rev and 1953 Cum Supp § 7.251 et seq.]).
Examination of this earlier statute indicates beyond question that it is in no sense a tax upon the right to do business. On the contrary, it is plainly an ad valorem tax upon the value of the property of railroad and certain other transportation and communication companies, levied in lieu of local property taxes.
The title to the act begins, "An act to provide for the assessment of the property * * * of railroad companies." (Emphasis supplied.)
Section 5 provides:
"The term property, as used in this act, shall be deemed to include all property, real or personal, belonging to * * * corporations * * * subject to taxation under this act."
There follows a list of real and personal properties, concluding:
"and all other real and personal property, and all franchises, said franchises not to be directly assessed, but to be taken into consideration in determining the value of the other property." CL 1918 § 207.5 (Stat Ann 1950 Rev § 7.255).
It is this last language upon which appellant bases his State constitutional arguments.
We believe the statutory language itself provides the answer. It recites, as if in anticipation of this argument, "said franchises not to be directly assessed, but to be taken into consideration in determining the value of the other property."
The statute in question makes crystal clear its ad valorem nature when it provides for the tax as to these taxpayers to be in lieu of all taxes for State and local purposes (CL 1948, § 207.14 [Stat Ann *667 1950 Rev § 7.264]), and further provides for the State board to certify they have estimated and assessed the same at what they "believe to be the true cash value thereof, and * * * have assessed the taxes thereon at the average rate of taxes for State, county, township, school, municipal and other purposes levied through this State during the preceding year as determined by us."
This subject of taxation argument has been dealt with and settled by this Court in Western Electric Co. v. Department of Revenue, 312 Mich 582, which required construction and application of article 10, § 1, Michigan Constitution (1908), which appellant in this case asserts as a bar to the instant tax because by its terms it is payable to the general fund:
"All subjects of taxation now contributing to the primary school interest fund under present laws shall continue to contribute to that fund."
Under the constitutional interpretation given by this Court, the words "all subjects of taxation" do not refer to particular taxpayers. This Court has held the phrase "connotes a deeper significance, the underlying principle on which the tax is designed and imposed." Western Electric Co. v. Department of Revenue, supra, 589.
In our case, the subject of taxation then contributing to the primary school interest fund was set forth as far as appellant is concerned in PA 1905, No 282. This tax has been construed, and in our opinion can only be construed, as providing "for the taxing of the property of certain corporations on an ad valorem basis." Western Electric Co. v. Department of Revenue, supra, 593.
On the other hand, the instant tax has, as we have seen, been construed repeatedly as a tax imposed upon the right to do business within the State. Union Steam Pump Sales Co. v. Secretary of State, 216 *668 Mich 261; In re Detroit International Bridge Co., 257 Mich 52, aff'd, Detroit International Bridge Co. v. Corporation Tax Appeal Board of Michigan, 287 US 295 (53 S Ct 137, 77 L ed 314); Cleveland-Cliffs Iron Co. v. Corporation & Securities Commission, supra.
The franchise tax imposed upon appellant is not upon the same subject of taxation as the ad valorem tax on property imposed by PA 1905, No 282, and, hence, article 10, § 1, of the Constitution (1908) is not applicable.
For similar reasons, we hold inapplicable appellant's argument that the franchise tax constitutes double taxation or violates the uniformity provisions of article 10, §§ 3 and 4, Const (1908), when applied to appellant in conjunction with PA 1905, No 282. The 2 taxes are not upon the same subject or for the same purpose. C.F. Smith Co. v. Fitzgerald, 270 Mich 659.
See, also, 1 Cooley on Taxation (4th ed), § 223.
Nor does the franchise tax discriminate against railroads or offend the due process clause of the Michigan Constitution (1908), art 2, § 16. Appellant's right to do business within Michigan is taxed only once as is that of every other profit corporation doing business within this State. Union Steam Pump Sales Co. v. Secretary of State, supra.
Affirmed. No costs, public questions being involved.
SMITH. BLACK, and VOELKER, JJ., concurred with EDWARDS, J.
KELLY, J. (dissenting in part).
The 1952 legislature amended the general corporation fee act (PA 1921, No 85) by adding section 5b and, for the first time, imposed an annual franchise tax on railroad corporations, as follows:
*669 "Sec. 5b. For the purpose of determining the annual franchise fee, the tax payable by a railroad company shall be measured by that portion of its paid-up capital and surplus determined by the average of the following 2 percentage ratios: The net ton miles of freight handled in this State to the total net ton miles of freight handled within and without the State; the number of miles of all track over which it operates within this State to the total number of miles of all track over which it operates within and without the State." (CLS 1952, § 450.305b, Stat Ann 1953 Cum Supp § 21.208[2].)
Section 5b has since been amended, but this formula prevailed in 1952 and is involved in this appeal.
My Brother cites over 30 United States supreme court decisions, but section 5b is unique not only because it was the first effort by the Michigan legislature to impose an annual special franchise tax on railroads but, also, because the legislature created a formula different than the numerous formulas adopted by legislatures of other States and passed upon by the United States supreme court.
The main question is whether the formula applied by the commission to appellant's paid-up capital and surplus to determine the portion thereof allocable to Michigan is offensive to the commerce clause of the United States Constitution. Justice EDWARDS decides it is not, and I conclude that it is offensive.
In determining the tax, the commission and the appeal board found as factor number 1 that the net ton miles of freight in Michigan (interstate and intrastate) was 532,709,000, which would constitute 78.61% of appellant's total 677,639,000 net ton miles of freight carried by petitioner in 1951. The commission then decided as factor number 2 that there was in Michigan 558.37 miles of trackage out of the total 637.85 miles of appellant's trackage, which would make the Michigan trackage 81.18% of the *670 total trackage. From these 2 factors, the commission arrived at the conclusion that 79.8943% of appellant's paid-up capital and surplus was allocable to Michigan for the purpose of the 1952 franchise tax.
Appellant contends that:
"Under the decisions of this Court and of the supreme court of the United States, the commission and the board should have omitted all consideration of the `net ton miles of freight' transported by petitioner from points within Michigan to points outside of it, from points outside of Michigan to points within it, and between points both of which were outside of it; and the calculation of the portion of a petitioner's paid-up capital and surplus allocable to Michigan should have been made as follows:

 "Net ton miles of freight:
 61,031,000 (Michigan intrastate)
 ____________________________________ = 9.00%
 677,639,000 total)
 "Trackage:
 558.37 (in Michigan) 81.18%
 _____________________ = __________
 687.85 (total) 90.18%
 __________
 ÷ 2 = 45.09%

"Properly only 45.09% of the paid-up capital and surplus of petitioner is allocable to Michigan for the purposes of this tax. The commission and the appeal board have allocated 79.895% thereof to this State. * * *
"The error in the interpretation and application of the allocation formula alone caused the assessment of a tax excessive in the amount of $16,975.44."
The tax in question is a franchise tax based, in part, on ton miles of freight transported in interstate commerce.
*671 A State cannot levy a franchise tax on the privilege of engaging in interstate commerce within its border.
Cooney v. Mountain States Telephone & Telegraph Co., 294 US 384 (55 S Ct 477, 79 L ed 934), dealt with the State of Montana's right to levy an occupation tax on a telephone company. The supreme court stated (pp 392, 393):
"There is no question that the State may require payment of an occupation tax from one engaged in both intrastate and interstate commerce. But a State cannot tax interstate commerce; it cannot lay a tax upon the business which constitute such commerce or the privilege of engaging in it. And the fact that a portion of a business is intrastate and therefore taxable does not justify a tax either upon the interstate business or upon the whole business without discrimination. * * * Where the tax is exacted from one doing both an interstate and intrastate business, it must appear that it is imposed solely on account of the latter; that the amount exacted is not increased because of the interstate business done; that one engaged exclusively in interstate commerce would not be subject to the tax; and that the one who is taxed could discontinue the intrastate business without also withdrawing from the interstate business."
In deciding East Ohio Gas Co. v. Tax Commission of Ohio, 283 US 465 (51 S Ct 499, 75 L ed 1171), the supreme court left no doubt that a State cannot increase its tax on interstate commerce by any device calling for the inclusion of ton miles of interstate freight and, further, that transactions which are an essential and integral part of interstate commerce cannot be considered. The court expressed its views as follows (p 470):
"It is elementary that a State can neither lay a tax on the act of engaging in interstate commerce *672 nor on gross receipts therefrom. * * * And, while a State may require payment of an occupation tax by one engaged in both intrastate and interstate commerce, the exaction in order to be valid must be imposed solely on account of the intrastate business without enhancement because of the interstate business done, and it must appear that one engaged exclusively in interstate business would not be subject to the imposition and that the taxpayer could discontinue the intrastate business without withdrawing also from the interstate business."
In Gartland Steamship Co. v. Corporation & Securities Commission, 339 Mich 661, the Court followed the United States supreme court's rulings as set forth above and ordered the commission to recompute the franchise fee "excluding any and all cargoes transported in interstate and foreign commerce."
In Panhandle Eastern Pipe Line Co. v. Corporation & Securities Commission, 346 Mich 50, we dealt with a legislative-created franchise fee formula (section 5 of the corporation fee act [CLS 1952, § 450.305; Stat Ann 1953 Cum Supp § 21.208]) which provided that the ratio of corporate Michigan property to total corporate property; plus a ratio of Michigan wages to total wages; plus 1/2 of the receipts from Michigan interstate sales to all sales, should determine the tax. We held that the formula could not include the 1/2 of the sale of gas in interstate commerce.
Justice EDWARDS endeavors to reconcile his opinion with our previous opinions, as follows:
"Appellant relies heavily upon the Michigan cases of Gartland Steamship Co. v. Corporation & Securities Commission, 339 Mich 661; and Panhandle Eastern Pipe Line Co. v. Corporation & Securities Commission, 346 Mich 50.
"Both of these cases may be distinguished from our instant case on their facts. Gartland had no *673 property in Michigan and did what the Court apparently regarded as only an inconsequential intrastate business in Michigan. Over 90% of Panhandle's pipe line, properties and activities were located outside of Michigan. In addition, Panhandle involved the continuous flow of gas from the well-heads in the Southwest to Michigan customers. See Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 US 157 (74 S Ct 396, 98 L ed 583). Neither case involved the identical formula objected to here. And in both cases, this Court, while rejecting the specific formula, upheld the right to levy the tax and ordered recomputation under section 5e to achieve a reasonable result."
I do not agree with such a reconciliation. The fact remains that it is not the ownership of propery within this State that is in issue, but the attempt to use the ton miles of freight transported in interstate commerce.
I agree with my Brother's conclusion that the commission did not err in its determination of the value of paid-up capital and surplus.
The determination should be reversed, with order that the commission recompute tax excluding ton miles of freight transportation in interstate commerce.
DETHMERS, C.J., and CARR, J., concurred with KELLY, J.
KAVANAGH, J., did not sit.
NOTES
[*] See, also, Stat Ann § 21.82 and supplements.  REPORTER.
[**] See, currently, 11 USCA, § 205.  REPORTER.
[***] See, currently, CLS 1956, §§ 450.82, subd (p) and 450.305.  REPORTER.
[****] See Mr. Justice Douglas, dissenting in part, Joseph v. Carter & Weekes Stevedoring Co., 330 US 422, 445 (67 S Ct 815, 827, 91 L ed 993, 1010).
[*****] See last portion of this opinion.
[******] See Page's Ohio Rev Code Ann, § 5733.05.  REPORTER.
[*******] See interesting critique on these cases, Phillips, The Allocation Formula Under the Michigan Annual Franchise Tax, 35 Taxes, March, 1957, 162.
[********] It should be noted that no Federal due process question is presented to us in this case presumably because the interstate-commerce factor complained of was a part of "the net ton miles of freight handled in this State." CLS 1952, § 450.305b (Stat Ann 1953 Cum Supp § 21.208[2]). As to the effect of the due process clause upon inclusion of an out-of-State factor in the formula for measuring the value of the right to do intrastate business, see the excellent analysis in Mr. Justice SMITH'S opinion in Cleveland-Cliffs Iron Co. v. Corporation & Securities Commission, 351 Mich 652.